

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-12-00113-CV

THE CRAWFORD FAMILY FARM PARTNERSHIP, Appellant

V.

TRANSCANADA KEYSTONE PIPELINE, L.P., Appellee

On Appeal from the County Court at Law
Lamar County, Texas
Trial Court No. 80810

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

# O P I N I O N

## I.    Background

This is a case regarding an exercise of the right of eminent domain by a nongovernmental entity.  Historically, Americans in general and Texans in particular have placed great value on individual property rights and looked askance at the exercise of the power of eminent domain.  Both Amendment V of the United States Constitution and Article I, Section 17 of the Texas Constitution prohibit the taking of private property without just compensation.  As recently as 2009, the voters of Texas were presented with a proposed amendment to the State Constitution, which appeared on the ballot as Proposition Eleven, entitled, "Limits on power of eminent domain."  According to the Office of the Secretary of State of Texas, the proposition passed by a vote of 81.01 percent in favor and 18.98 percent opposed.[1]

Even so, from an early date in its history, Texas courts have recognized that the Legislature may delegate its power of eminent domain to nongovernmental entities.  *See Buffalo Bayou, Brazos & Colo. R.R. Co. v. Ferris*, 26 Tex. 588, 588 (1863).  The scope of the delegation of the government's power of eminent domain rests entirely with the elected representatives of the people, the State Legislature.  *Imperial Irr. Co. v. Jayne*, 104 Tex. 395, 417 (1911).

The crux of this lawsuit lies with the contention by The Crawford Family Farm Partnership (Crawford) that the pipeline planned by TransCanada Keystone Pipeline, L.P.[2] (TransCanada) fails to sufficiently fall within the specifications made by the Legislature to

---

[1]*Race Summary Report, 2009 Constitutional Amendment Election*, TX. SEC'Y OF STATE, http://elections.sos.state.tx.us/elchist.exe (select "2009 Constitutional Election" in drop-down menu; then select "Statewide Race Summary" radio button; then follow "Submit" hyperlink) (Nov. 3, 2009).

[2]TransCanada's petition was filed by and through its general partner, TransCanada Keystone Pipeline, GP, LLC.

authorize TransCanada to exercise the power of eminent domain to compel the grant of a pipeline right-of-way over Crawford lands.

TransCanada filed its original statement and petition for condemnation in the County Court at Law for Lamar County, wherein it sought to exercise the power of eminent domain to acquire an easement for a buried pipeline for the transmission of crude petroleum across rural real property owned by Crawford. The ensuing proceedings and Crawford's spokesperson have attracted substantial attention.[3] The Keystone Pipeline system owned by TransCanada as projected contemplates the installation and operation of a network of over 2,100 miles of pipeline for the transmission of crude petroleum which originates in Canada, traversing markets within the midwest United States to Cushing, Oklahoma. The crude petroleum which is gathered at Cushing, Oklahoma, enters a portion of the Keystone Pipeline System known as the Gulf Coast Project, which crosses over into Texas to its ultimate destination in the Port Arthur, Texas, area.[4] It is this Gulf Coast Project portion of the pipeline that has been planned to traverse the Crawford property in Lamar County.

TransCanada, under authority statutorily granted to common carriers, seeks to invoke the power of eminent domain for the purpose of obtaining the necessary easements and rights-of-way to construct a buried pipeline thirty-six inches in diameter across the Crawford property. After TransCanada filed its papers seeking the right to cross the Crawford property, the trial court appointed three special commissioners to assess the condemnation damages due the

---

[3]Megan James, *Checking the Box is Not Enough:  The Impact of Texas Rice Land Partners, Ltd. v. Denbury Green Pipeline-Texas and Texas's Eminent Domain Reforms on the Common Carrier Application Process*, 45 TEX. TECH L. REV. 959 (2013).

[4]Because the Gulf Coast Project does not cross an international border, it does not require a presidential permit.

landowner. After due notice of a hearing (which Crawford apparently opted to not attend), the commissioners awarded the easements to TransCanada and assessed condemnation damages of $10,395.00.[5] Crawford appealed the commissioner's award in the County Court at Law, and, on February 21, 2012, a notice was sent by the clerk that the matter had been set for a bench trial April 30, 2012.[6]

Thereafter, TransCanada filed a combined traditional and no-evidence motion for summary judgment. In its motion for summary judgment, TransCanada alleged that its summary judgment proof established, as a matter of law, its common carrier status with the right of eminent domain; the motion also alleged that there was no evidence to support Crawford's counterclaims of gross negligence and fraud.

Crawford responded to TransCanada's motion for summary judgment by raising a new argument—that because TransCanada is an interstate pipeline which contemplates the transmission of crude oil, it is not a common carrier under Section 111.002(1) and (6) of the Texas Natural Resources Code. *See* TEX. NAT. RES. CODE ANN. § 111.002(1), (6) (West 2011).[7]

---

[5]TransCanada deposited double the damage amount into the registry of the court.

[6]This trial date was ultimately continued to September 2012. In the interim, Crawford filed a document with this Court nominally seeking mandamus relief but, alternatively, asking this Court to treat the document as its attempt to perfect an interlocutory appeal and as its appellate brief. This Court denied the petition for writ of mandamus, and the document was treated as a notice of appeal from the trial court's order denying a temporary injunction. This appeal was dismissed for want of prosecution.

[7]Although Crawford had previously asserted multiple other claims and defenses (including alleged failures to comply with requirements of the Texas Property Code, to file permits, to provide a required material safety data sheet report, and to negotiate in good faith, along with claims that the proposed pipeline will not be transporting crude petroleum, that there had been a denial of a required presidential permit for the pipeline, and that TransCanada had violated the Texas Antiquities Code and been guilty of gross negligence, entitling Crawford to punitive damages), these claims were addressed in neither Crawford's summary judgment response nor its brief on appeal. *See San Jacinto River Auth. v. Duke*, 783 S.W.2d 209–10 (Tex. 1990) (per curiam) (it is "well-established rule that

4

While the summary judgment motion was pending, Crawford filed its fourth motion for continuance, asking for an extension of time after substitution of counsel.[8] The trial court, while denying the continuance motion to the extent that Crawford sought additional time to conduct discovery, amend or supplement pleadings, or designate experts, granted it in all other respects, extending the deadlines for the filing of *Daubert*[9] challenges and dispositive motions.

In addition, the trial court's order rescheduled the trial for September 4, 2012. A final pretrial hearing was rescheduled for August 10. On that date, Crawford filed a motion to dismiss for want of jurisdiction, this motion being based on the same argument Crawford had advanced in its response to TransCanada's motion for summary judgment. Crawford's motion to dismiss was heard at the pretrial hearing, together with TransCanada's motions for summary judgment[10] and for writ of possession. The trial court entered an order granting TransCanada a writ of possession, finding TransCanada had "satisfied all of the requirements of § 21.021 of the Texas Property Code."[11]

---

grounds of error not asserted by points of error or argument in the court of appeals are waived") (citing *Gulf Coast State Bank v. Emenhiser*, 562 S.W.2d 449, 452–53 (Tex. 1978)).

[8]On June 12, 2012, the trial court entered an order substituting Wendi Hammond as counsel for Crawford. Hammond replaced John Pieratt and Mark Lesher.

[9]*Daubert v. Merrel Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[10]At the pretrial hearing, the parties stipulated the amount of damages as determined by the special commissioners—$10,395.00—thus, rendering moot TransCanada's *Daubert* motions. The parties further stipulated that Crawford was to withdraw its objection to TransCanada's petition under the Texas Antiquities Code.

[11]This section of the Texas Property Code permits the condemnor to take possession of the condemned property after the special commissioners have made an award in a condemnation proceeding, pending the results of further litigation, when the section's requirements have been satisfied. TEX. PROP. CODE ANN. § 21.021 (West 2004).

The trial court entered an order on August 27 that denied Crawford's motion to dismiss, which claimed the trial court lacked jurisdiction to hear TransCanada's petition. On the same date, the trial court entered a summary judgment order granting TransCanada's motion for combined traditional and no-evidence summary judgment. The trial court entered its amended final judgment September 4, awarding TransCanada a fifty-foot-wide, nonexclusive, permanent easement and a right-of-way to access the easement.[12] The judgment specifically included the following:

> TransCanada has the legal capacity to bring this proceeding and to recover the easements sought; TransCanada is a common carrier; [Crawford] is the owner of the Property; that there is a public necessity for the Easements along, across, and over the Property sought in this proceeding by TransCanada and that TransCanada has strictly complied with the statutes authorizing this condemnation proceeding.

On appeal, Crawford contends that (1) the trial court erred in denying its motion to dismiss for want of jurisdiction, (2) the trial court erred in granting TransCanada's combined traditional and no-evidence motion for summary judgment, and (3) the trial court erred by denying, in part, Crawford's fourth motion for a continuance.

---

[12]The crux of the final judgment sets forth the respective rights and liabilities of the parties regarding the easement. An amended final judgment was entered on September 4. The only apparent change is the attachment of Exhibit "A," which includes easement plats, various legal descriptions, and a survey.

## II. Analysis

### A. The Trial Court Correctly Denied Crawford's Motion to Dismiss for Lack of Jurisdiction

#### 1. Standard of Review

A plea to the jurisdiction challenges the trial court's authority to determine the subject matter of the action. *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). Whether a trial court has subject-matter jurisdiction is a question of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). "Whether a pleader has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction is a question of law reviewed *de novo.*" *Id.* When a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000) (confining evidentiary review of evidence relevant to jurisdictional issues). We take as true all evidence favorable to the nonmovant, indulge every reasonable inference, and resolve any doubts in the nonmovant's favor. *Miranda*, 133 S.W.3d at 228. If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact question will be resolved by the fact-finder. *Id.* at 227–28; *Bland*, 34 S.W.3d at 555. If the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, however, the trial court rules on the plea to the jurisdiction as a matter of law. *Miranda*, 133 S.W.3d at 228; *Bland*, 34 S.W.3d at 555. This standard "generally mirrors that of a summary judgment under [Rule 166a(c)]." *Miranda*, 133 S.W.3d at 228.

7

## 2. The Jurisdictional Challenge

Only an entity with eminent domain authority may condemn real property. TEX. PROP. CODE ANN. § 21.012 (West Supp. 2012). "District courts and county courts at law have concurrent jurisdiction in eminent domain cases." TEX. PROP. CODE ANN. § 21.001 (West 2004). Crawford's jurisdictional claim is based on the premise that TransCanada does not possess the power of eminent domain; accordingly, Crawford contends that the trial court lacked the jurisdiction to hear this case. In Texas, "[c]ommon carriers have the right and power of eminent domain." TEX. NAT. RES. CODE ANN. § 111.019(a) (West 2011). In the exercise of that power, "a common carrier may enter on and condemn the land, rights-of-way, easements, and property of any person or corporation necessary for the construction, maintenance, or operation of the common carrier pipeline." TEX. NAT. RES. CODE ANN. § 111.019(b) (West 2011). Thus, TransCanada's right of eminent domain depends on its status as a common carrier under Texas law.[13] "It is required that the condemnor have the statutory authority to condemn as a prerequisite to invoking the court's jurisdiction." *Gulf Ref. Co. v. A.F.G. Mgmt. 34 Ltd.*, 605 S.W.2d 346, 347 (Tex. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.), *overruled on other grounds by Lewis v. Blake*, 876 S.W.2d 314, 315 (Tex. l994) (per curiam). Crawford asks this Court to address the sole issue of whether TransCanada qualifies as a Texas common carrier endowed with eminent domain authority "that wields the enormous power to condemn and seize

---

[13]"Unlike gas pipelines, oil pipelines lack the federal eminent domain authority and federal preemptive rights that accompany the FERC natural gas certificate process . . . ." Christopher J. Barr, *Growing Pains: FERC'S Responses to Challenges to the Development of Oil Pipeline Infrastructure*, 28 Energy L.J. 43, 49–50 (2007). Accordingly, eminent domain is subject to "a patchwork quilt of differing state laws." *Id.* For example, Ohio only grants eminent domain authority to crude pipelines, while Connecticut provides no eminent domain authority to oil pipelines. *Id.* at 50 n.30.

private property against the will of a landowner." Crawford maintains that (1) because a common carrier is subject to the provisions of Chapter 111 of the Texas Natural Resources Code and TransCanada is not subject to (all of) those provisions, it is not a common carrier, (2) TransCanada is not a common carrier because the Texas Railroad Commission determined that it lacks jurisdiction over TransCanada's interstate pipeline, and (3) legislative history supports Crawford's arguments.

### 3. TransCanada Is a Common Carrier With the Right of Eminent Domain

#### a. TransCanada Is Subject to the Applicable Provisions of Chapter 111

TransCanada relies on Section 111.002(1) of the Texas Natural Resources Code as authority for its claim to common carrier status. This section provides,

> A person is a common carrier subject to the provisions of this chapter if it:
> (1) owns, operates, or manages a pipeline or any part of a pipeline in the State of Texas for the transportation of crude petroleum to or for the public for hire, or engages in the business of transporting crude petroleum by pipeline . . . .

TEX. NAT. RES. CODE ANN. § 111.002(1).[14] Crawford contends that even though "common carrier" is broadly defined, eminent domain authority is limited *only* to common carriers subject

---

[14]TransCanada also relies on Section 2.105 of the Texas Business Organizations Code for its claim of eminent domain authority. Section 2.105 provides that a corporation or other specified entity "engaged as a common carrier in the pipeline business for the purpose of transporting oil, oil products, . . . or other mineral solutions has all the rights and powers conferred on a common carrier by Sections 111.019–111.022, Natural Resources Code." BUS. ORG. CODE ANN. § 2.105 (West 2012). This provision does not, however, address the issue of how one qualifies as a common carrier. Crawford does not address this provision in its brief. TransCanada points out that this provision does not distinguish between intrastate and interstate carriers.

to *each* of the provisions of Chapter 111.[15]  In support of this contention, Crawford relies on the language preceding subsection (1) stating that "[a] person is a common carrier subject to the provisions of this chapter."  This phrase, as interpreted by Crawford, limits common carrier status to entities subject to *all* of the provisions of Chapter 111.  Such an interpretation, Crawford contends, is consistent with the concept that the legislative grant of eminent domain power is to be strictly construed.  *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC*, 363 S.W.3d 192, 198 (Tex. 2012) ("strict compliance with all statutory requirements is required. . . . [I]n instances of doubt as to the scope of the power, the statute granting such power is 'strictly construed in favor of the landowner and against those corporations and arms of the State vested therewith.'")[16] (quoting *Coastal States Gas Producing Co. v. Pate*, 309 S.W.2d 828, 831 (Tex. 1958)) (citations omitted).  Crawford contends that because TransCanada is an interstate pipeline, it cannot subject itself to all of the provisions of Chapter 111.[17]  These "other

---

[15]It is undisputed that TransCanada engages in the business of transporting crude petroleum by pipeline or part of a pipeline and engages in the business of transporting crude petroleum by pipeline.  Crawford disputes TransCanada's "public use" status.

[16]*State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 640 (Tex. 2001), is cited in support of the proposition that "strict compliance with all statutory requirements is required." ("Proceedings to condemn land are special in character, and the party attempting to establish its right to condemn must show strict compliance with the law authorizing private property to be taken for public use.").

[17]Crawford provides examples of "other provisions" of Chapter 111 to which it claims TransCanada either cannot be subjected or with which it has failed to indicate compliance:

> No person, including a common carrier, may transport crude oil or petroleum in this state unless the crude oil or petroleum has been produced or purchased or both in accordance with the laws of this state or a rule of the commission made under those laws, or both.

TEX. NAT. RES. CODE ANN. § 111.004 (West 2011).

> A pipeline subject to the provisions of this chapter not exempt under Section 111.003, which is used in connection with the business of purchasing or purchasing and selling crude petroleum, or

10

in the business of transporting coal, carbon dioxide, hydrogen, feedstock for carbon gasification, the products of carbon gasification, or the derivative products of carbon gasification in whatever form by pipeline for hire in Texas, shall be operated as a common carrier and shall be subject to the jurisdiction of the commission.

TEX. NAT. RES. CODE ANN. § 111.013 (West 2011).

Common carriers shall make and publish their tariffs under rules prescribed by the commission.

TEX. NAT. RES. CODE ANN. § 111.014 (West 2011).

Subject to the law and the rules prescribed by the commission, a common carrier shall receive and transport crude petroleum delivered to it for transportation and perform its other related duties without discrimination.

TEX. NAT. RES. CODE ANN. § 111.015 (West 2011).

(a)    A common carrier in its operations as a common carrier shall not discriminate between or against shippers with regard to facilities furnished, services rendered, or rates charged under the same or similar circumstances in the transportation of crude petroleum.

(b)    A common carrier shall not discriminate in the transportation of crude petroleum produced or purchased by itself directly or indirectly.

TEX. NAT. RES. CODE ANN. § 111.016(a), (b) (West 2011).

(a)    No common carrier in its operations as a common carrier may charge, demand, collect, or receive either directly or indirectly from anyone a greater or lesser compensation for a service rendered than from another for a like and contemporaneous service.

TEX. NAT. RES. CODE ANN. § 111.017(a) (West 2011).

(a)    A common carrier shall exchange crude petroleum tonnage with each like common carrier.

TEX. NAT. RES. CODE ANN. § 111.023(a) (West 2011).

(a)    No common carrier may abandon any of its connections or lines except under authority of a permit granted by the commission or with written consent of the owner or duly authorized agent of the wells to which connections are made.

(b)    Before granting a permit to abandon any connection, the commission shall issue proper notice and hold a hearing as provided by law.

TEX. NAT. RES. CODE ANN. § 111.025(a), (b) (West 2011).

11

provisions," Crawford contends, necessarily become qualifying elements which limit the basic common carrier definition set forth in Section 111.002.

Crawford focuses its argument on Sections 111.014 ("Common carriers shall make and publish tariffs under rules prescribed by the commission") and 111.181 ("The commission shall establish and promulgate rates of charges for . . . transport[ ] and deliver[y of] crude petroleum by common carriers . . . ."). *See* TEX. NAT. RES. CODE ANN. §§ 111.014, 111.181. TransCanada cannot comply with these provisions under any circumstance, Crawford contends, because the tariff of an interstate crude oil pipeline is not subject to the rate-setting powers of the Texas Railroad Commission but, instead, is subject to that jurisdictional power of the Federal Energy Regulatory Commission (FERC).[18] *See* 49 U.S.C. § 60502 (West 2013) (FERC "has the duties

---

If more crude petroleum is offered for transportation by a common carrier than can be transported immediately, it shall be apportioned equitably, and the commission may make and enforce general or specific rules for equitable apportionment.

TEX. NAT. RES. CODE ANN. § 111.142 (West 2011).

The commission shall establish and promulgate rates of charges for gathering, transporting, loading, and delivering crude petroleum by common carriers in this state and for use of storage facilities necessarily incident to this transportation.

TEX. NAT. RES. CODE ANN. § 111.181 (West 2011).

[18]Federal regulation of oil pipelines began in 1906 when Congress passed the Hepburn Act. *ExxonMobil Oil Corp. v. F.E.R.C.*, 487 F.3d 945, 956 (D.C. Cir. 2007) (per curiam). The Act applied the Interstate Commerce Act to oil pipelines and gave the Interstate Commerce Commission jurisdiction over interstate oil pipelines. In 1977, Congress transferred responsibility for oil pipeline regulation to the FERC. *Id*. The FERC's jurisdiction over oil pipelines is limited primarily to interstate pipeline rates. *See Farmers Union Cent. Exch., Inc. v. F.E.R.C.*, 734 F.2d 1486, 1509 n.51 (D.C. Cir. 1984) (FERC has no authority over interstate oil pipeline's decision to abandon service); *see also W. Ref. Sw., Inc. v. F.E.R.C.*, 636 F.3d 719, 724 (5th Cir. 2011) (FERC has no jurisdiction over decision by pipeline to purchase, lease, or contract to operate pipeline). The limited scope of the FERC's regulation of oil pipelines stands in contrast to its pervasive role in pipeline infrastructure under the Natural Gas Act, which prohibits a would-be pipeline sponsor from digging a line until a certificate of public convenience and necessity is issued. *See generally*

and powers related to the establishment of a rate or charge for the transportation of oil by pipeline . . .").  Because TransCanada cannot subject itself to these provisions of the state law, Crawford contends that TransCanada cannot meet the definition of a common carrier (carrying with it, the right of eminent domain) under Section 111.002(1) of the Natural Resources Code. TEX. NAT. RES. CODE ANN. § 111.002(1).  We disagree.

Crawford's conclusion that TransCanada cannot meet the definition of a common carrier is based on the premise that the introductory phrase ("A person is a common carrier subject to the provisions of this chapter.") means that any such common carrier must comply with each and every provision set forth in Chapter 111 of the Natural Resources Code.  We do not believe this is a proper reading of the statute.  First, the language preceding the definition of "common carrier" does not specifically state that such common carrier is subject to *all* of the provisions of the chapter.  It merely states, in a descriptive manner, that a common carrier under this section is one that is subject to the provisions of the chapter.  Moreover, this language does not confer common carrier status to such carriers *only if* they are subject to each of the provisions of the chapter.[19]

---

*Independence Pipeline Co., et al.*, 91 F.E.R.C. 61102, 61347, 2000 WL 490943, at *21 (Apr. 26, 2000).  The FERC does, however, have exclusive jurisdiction to determine whether pipeline rates and terms of service are just, reasonable, and not unduly discriminatory.  18 C.F.R. § 342.4 (2011); Christopher J. Barr, *Unfinished Business*: *FERC's Evolving Standard for Capacity Rights on Oil Pipelines*, 32 Energy L.J. 563, 565 (2011).

[19]Subsections (6) and (7) provide that a person is a common carrier subject to the provisions of Chapter 111 if it:

> (6)  owns, operates, or manages, wholly or partially, pipelines for the transportation of carbon dioxide or hydrogen in whatever form to or for the public for hire, but *only if* such person files with the commission a written acceptance of the provisions of this chapter expressly agreeing that, in consideration of the rights acquired, it becomes a common carrier subject to the duties and obligations conferred or imposed by this chapter; or

Crawford misinterprets this opening phrase as being prescriptive, rather than descriptive. The language "subject to the provisions of this chapter" is merely descriptive of the type of common carrier to which reference is made. For example, the operator of a municipal transit system is generally recognized as a common carrier. *See Transit Mgmt. Co. of Laredo v. Sanchez*, 886 S.W.2d 823, 824–25 (Tex. App.—San Antonio 1994, no writ). Even so, a municipal transit system is not the type of common carrier that is subject to the provisions of Chapter 111. Here, TransCanada is such a common carrier as contemplated in Chapter 111. However, because TransCanada owns and operates an interstate crude oil pipeline, it is subject to the rate-setting jurisdiction of the FERC and not the similar powers that would otherwise be exercised by Texas regulatory authorities.

> **b.    TransCanada's Status as an Interstate Carrier Does Not Impair its Status as a Common Carrier**

Crawford maintains that, correctly construed, a common carrier with eminent domain authority under Chapter 111 does not include an owner or operator of a solely interstate pipeline, the purpose of which is to transport into Texas crude petroleum from outside the State of Texas.

---

(7)    owns, operates, or manages a pipeline or any part of a pipeline in the State of Texas for the transportation of feedstock for carbon gasification, the products of carbon gasification, or the derivative products of carbon gasification, in whatever form, to or for the public for hire, but *only if* the person files with the commission a written acceptance of the provisions of this chapter expressly agreeing that, in consideration of the rights acquired, it becomes a common carrier subject to the duties and obligations conferred or imposed by this chapter.

TEX. NAT. RES. CODE ANN. § 111.002(6), (7) (West 2011) (emphasis added). In the trial court (and perhaps less clearly on appeal), Crawford maintained that (in a variation of its current position) the definition of "common carrier" is limited by the requirements of subsection (6). This argument, however, was correctly rejected by our sister court in *Rhinoceros Ventures Grp., Inc. v. TransCanada Keystone Pipeline, L.P.*, 388 S.W.3d 405, 409 (Tex. App.—Beaumont 2012, pet. denied). The court noted that the subsections within Section 111.002 are connected disjunctively by the use of the word "or." "Therefore, if an entity meets the requirements for common-carrier status contained in section 111.002(1), it need not also meet the requirements of section 111.002(6)." *Id.* Finally, the court noted that subsection (6) is expressly limited to pipelines for the transportation of carbon dioxide or hydrogen. *Id.*

14

Crawford's argument here primarily relies on the notion that strict compliance with all statutory requirements under Chapter 111 is required, pointing out that in instances of doubt as to the scope of eminent domain power, the statute granting such power is "'strictly construed in favor of the landowner and against'" the person or entity seeking to exercise the power of condemnation. *Denbury*, 363 S.W.3d at 198 (quoting *Coastal States Gas Producing*, 309 S.W.2d at 831).

Section 111.002(1) contains two separate clauses that define a common carrier. The first clause provides that a person is a common carrier if it "owns, operates, or manages a pipeline or any part of a pipeline in the State of Texas for the transportation of crude petroleum to or for the public for hire . . . ." TEX. NAT. RES. CODE ANN. § 111.002(1). The second clause provides that a person is a common carrier if it "engages in the business of transporting crude petroleum by pipeline . . . ." *Id.* Neither clause makes any kind of distinction between intrastate and interstate pipelines.

The Texas Railroad Commission is imbued with the authority to regulate common carrier pipelines. TEX. NAT. RES. CODE ANN. § 81.051 (West 2011).[20] This authorization of power

_____

[20]This provision addresses the jurisdiction of the Texas Railroad Commission, and provides,

> (a)      The commission has jurisdiction over all:
>
>          (1) common carrier pipelines defined in Section 111.002 of this code in Texas;
>
>          (2) oil and gas wells in Texas;
>
>          (3) persons owning or operating pipelines in Texas; and
>
>          (4) persons owning or engaged in drilling or operating oil or gas wells in Texas.

15

makes no distinction between intrastate and interstate pipelines. Instead, this section has been held to give the commission regulatory authority over anyone who owns or operates pipelines in Texas. *See Bullock v. Shell Pipeline Corp.*, 671 S.W.2d 715, 719 (Tex. App.—Austin 1984, writ ref'd n.r.e.) (noting that commission has jurisdiction over crude products line running from Texas to Louisiana with "specific jurisdiction and duty to issue a permit . . . for the transportation of oil productions by pipeline" and that pipeline owner held permit from ICC (predecessor of FERC)); *see also Atlas Pipe Line Co. v. Sterling*, 4 F. Supp. 441, 442 (E.D. Tex. 1933) (per curiam) ("No reason presents itself to our minds for believing that the Legislature, having the authority to conserve the natural resources of the state, is without power to impose upon common carriers by pipeline, inter and intra state, police regulations to make its prohibition against wasteful production effective.").

Moreover, had the Legislature intended to exclude interstate petroleum pipelines from the definition of common carrier, it could have easily done so with an express limitation. It did not. The principle of *exclusion unius* recognizes that "'[t]he inclusion of the specific limitation excludes all others.'" *Zamora v. Edgewood Indep. Sch. Dist.*, 592 S.W.2d 649, 650 (Tex. Civ. App.—Beaumont 1979, writ ref'd n.r.e.) (quoting *Harris Co. v. Crooker*, 248 S.W. 652, 655 (Tex. 1923)). Expressly excluded from Chapter 111's provisions are "pipelines that are limited in their use to the wells, stations, plants, and refineries of the owner and that are not a part of the pipeline transportation system of a common carrier as defined in Section 111.002 of this code."

---

(b)     Persons listed in Subsection (a) of this section and their pipelines and oil and gas wells are subject to the jurisdiction conferred by law on the commission.

TEX. NAT. RES. CODE ANN. § 81.051.

16

TEX. NAT. RES. CODE ANN. § 111.003 (West Supp. 2012). Similarly, Chapter 111 places certain express limitations on the exercise of eminent domain authority. TEX. NAT. RES. CODE ANN. § 111.0192 (West 2011) (limitation of eminent domain rights on pipelines transporting coal). Chapter 111, however, places no express limitation on the grant of eminent domain power to persons transporting crude petroleum by interstate pipeline. The Legislature's other express limitations in Sections 111.003 and 111.092 preclude reading an "interstate" or "foreign production" exclusion into Section 111.002(1). *See* TEX. NAT. RES. CODE ANN. §§ 111.003, 111.092.

In the recent case of *Rhinoceros Ventures Group* (a case so similar to the case before us in that one of the litigants is the same, it involves another part of the same leg of the contemplated pipeline system as here, and virtually the same issues are raised), our sister court arrived at the same conclusion at which we arrive here. In that case, the parties agreed that TransCanada—as here—engages in the business of transporting crude petroleum in Texas by a pipeline or a part of a pipeline. "Therefore, construing section 111.002(1) according to its plain meaning, TransCanada is a common carrier." *Rhinoceros Ventures Grp.*, 388 S.W.3d at 408. The Beaumont court rejected the notion that this section applies only to intrastate pipelines, noting that the Legislature did not use the words "interstate" or "intrastate" in Section 111.002(1) when describing the type of pipeline the section describes. It was, therefore, presumed that such terms were excluded for a reason. *Id.*

Finally, the Legislature's silence with respect to terms used elsewhere in a statute is indicative of its intent. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex.

17

1981) ("[W]e believe every word excluded from a statute must also be presumed to have been excluded for a purpose[.]").  The Legislature has drawn intrastate/interstate distinctions in other sections of the Natural Resources Code.  For example, Section 117.012 provides that the commission "shall adopt rules that include safety standards for and practices applicable to the intrastate transportation of hazardous liquids or carbon dioxide by pipeline and intrastate hazardous liquid or carbon dioxide pipeline facilities . . . ."  TEX. NAT. RES. CODE ANN. § 117.012 (West Supp. 2012).  By contrast, Section 111.002(1) contains no such limiting language, and no such language can be reasonably read into the statute.[21]

### c.   TransCanada is Subject to the Jurisdiction of the Texas Railroad Commission

Crawford further maintains that TransCanada is not subject to the jurisdiction of the Commission because the Commission said it was not subject to their jurisdiction.  In response to its application for a T-4 permit to operate a pipeline in Texas, the Texas Railroad Commission wrote the following letter to TransCanada:

---

[21]We further note that the Commission's definition of "transportation or to transport" is sufficiently broad to include interstate transportation:

> The movement of any crude petroleum oil or products of crude petroleum oil or the products of either from *any receptacle* in which any such crude petroleum or products of crude petroleum oil or the products of either has been stored to *any other receptacle* by any means or method whatsoever, including the movement *by any pipeline* . . . .  It is the purpose of this definition to include the movement or transportation of crude petroleum oil and products of crude petroleum oil and the products of either *by any means whatsoever from any receptacle containing the same to any other receptacle anywhere within or from the State of Texas*, regardless of whether or not possession or control or ownership change.

16 TEX. ADMIN. CODE ANN. § 3.79(25) (West 2013) (Tex. Dep't of Econ. Regulations, Definitions) (emphasis added).  A "[t]ransporter" includes "any common carrier by pipeline . . . and/or any person transporting oil or a product by pipeline . . . ."  *Id.* at § 3.79(26).

18

Review of the completed pipeline permit information questionnaire for systems operating under the above-referenced T-4 permit number has concluded the following:

Operations appear to be interstate and thereby under federal control.

On the basis of the conclusions, it appears the operations under the above referenced T-4 permit number do not at this time constitute those of a Railroad Commission jurisdictional hazardous liquids pipeline operator. However, at a future date, a representative of the Pipeline Safety Section may contact you telephonically or by on-site investigation to verify the conclusions listed herein.

Should your operation change by residential development or system expansion, notification must be made to the Gas Services Division of this Commission.

The letter references T-4 Permit Number 07873,[22] is dated October 21, 2008, and is signed by Kathy Arnold, engineering technician. Crawford argues that TransCanada is bound by this determination. TransCanada, on the other hand, states that this argument is unfounded because the Commission has permitted the pipeline as a common carrier interstate crude petroleum

---

[22]The form T-4 is needed for operational authority of the system. The instructions for the form T-4 state, "Operator must file a Form T-4 for each classification of pipeline(s) and/or gathering system(s), i.e., interstate, or intrastate, gas or liquid, or common carrier or private." A cover letter from Keystone legal counsel to the Railroad Commission transmitting various forms to the Commission, dated October 17, 2008, indicates:

> The purpose for these permit applications is to construct and operate the proposed Keystone Gulf Coast Expansion Project (Keystone XL), which is complementary to the Keystone Pipeline and would serve existing refineries and markets on the U.S. Gulf Coast in Texas. It would link a growing and reliable supply of Canadian crude oil with a rising North American demand for energy. The proposed project is an approximately 1,980-mile (3,200-kilometre), 36-inch crude oil pipeline that would begin at Hardisty, Alberta and extend southeast through Saskatchewan, Montana, South Dakota and Nebraska. It would incorporate a portion of the Keystone Pipeline to be constructed through Kansas to Cushing, Oklahoma, before continuing through Oklahoma to a delivery point near existing terminals in Nederland, Texas to serve the Port Arthur, Texas marketplace. Also proposed is an approximately 50-mile (80-kilometre) pipeline to the Houston, Texas marketplace. Keystone will be operated as one integrated pipeline system which will include the proposed Keystone XL pipeline project.

pipeline.[23] The permit certifies that Keystone "has complied with 16 TAC § 3.65 of the Commission Rules and Regulations governing pipelines in accordance with the Natural Resources Code § 81.051 and is granted this permit by the Commission to operate the following line or lines . . . ."[24] The permit has been amended twice since its initial issuance. This argument is without merit.

### d.    Crawford's Legislative History/Policy Argument

Crawford relies on the legislative history of the present provisions of the Natural Resources Code in support of its contention that TransCanada is not a common carrier

---

[23]Interestingly, on the date the referenced letter was drafted, the Commission also issued a permit to operate pipeline, in apparent contradiction to the letter. Both the letter upon which Crawford relies and the permit to operate the pipeline are signed by the same person. The new construction report issued by the Railroad Commission pipeline permitting and mapping department indicates that the pipeline will pass through the following Texas counties: Fannin, Lamar, Delta, Hopkins, Franklin, Wood, Upshur, Smith, Cherokee, Rusk, Nacogdoches, Angelina, Polk, Hardin, Jefferson, Liberty, Chambers, and Harris.

[24]This section, entitled "Pipeline Permits Required," states:

> (a) No pipeline or gathering system, whether a common carrier or not, shall be used to transport oil, gas, or geothermal resources from any tract of land within this state without a permit from the commission. Application for the permit shall be made upon the required form, and the permit will be granted if the commission is satisfied from such application and the evidence in support thereof, and its own investigation, that the proposed line is, or will be, so laid, equipped, and managed, as to reduce to a minimum the possibility of waste, and will be operated in accordance with the conservation laws and conservation rules and regulations of the commission.

> (b) The permit, if granted, shall be revocable at any time after hearing held after 10 days' notice, if the commission finds that the line is so unsafe, or so improperly equipped, or so managed, as likely to result in waste. If the commission finds the line is in such condition as to cause waste, five days' written notice shall be given to the operating company to correct the condition before notice of hearing for revocation of the permit is given. A permit may also be revoked after 10 days' notice and hearing, if the commission finds that the operator of the line, in its operation thereof, is willfully violating or contributing to the violation of the laws of Texas regulating the production, transportation, processing, refining, treating, and/or marketing of crude oil or geothermal resources, or any of the laws of the state to conserve the oil, gas, or geothermal resources, or any rule or regulation of the commission enacted under such laws.

16 TEX. ADMIN. CODE § 3.65 (2002). This section now appears at 16 TEX. ADMIN. CODE § 3.70 (West 2012) (Tex. Dep't of Econ. Regulation, Pipeline Permits Required). The language has not been altered.

possessing eminent domain powers. *See* TEX. GOV'T CODE ANN. § 311.023 (West 2013) (in construing statute, court may consider, *inter alia*, legislative history, common law or former statutory provisions). After citing the provisions of the 1917 law relating to common carriers, Crawford points out that from that time forward, the Texas Legislature limited common carrier pipelines to those pipelines subject to the jurisdiction, control, and regulations of the Texas Railroad Commission. Crawford argues that TransCanada cannot meet the current statutory provisions pertaining to common carriers (as previously discussed); thus, it contends, TransCanada cannot qualify as a common carrier and has no eminent domain authority. Crawford contends that when the initial Pipeline Petroleum Law of 1917 (Senate Bill 68, 35th Legislature, R.S.) was enacted, Texas was prompted by its interest in conserving the oil and gas resources of the state for the benefit of its producers in order that the value of the oil and gas would be guarded. This purpose cannot be achieved, Crawford contends, when the oil in the pipeline has been produced and sold in a foreign jurisdiction.

As Crawford correctly recognizes, the substance of the provisions found in the Natural Resources Code relating to the common carrier status of crude oil pipelines has remained virtually unchanged for over a century. We do not infer from the statute's language, however, that the Legislature intended its purposes to be anything other than what was expressly stated. Crawford's arguments to the contrary are more appropriately addressed to the Legislature; we may not judicially amend the statute to include an interstate or foreign production exception to the common carrier status of crude oil pipelines in Texas. *See Rhinoceros*, 388 S.W.3d at 408.

21

We conclude that TransCanada is a common carrier with the power of eminent domain. A simple statutory construction analysis indicates that Section 111.002(1) covers both interstate and intrastate carriers. *Atlas Pipeline* held that the Commission has regulatory authority over interstate pipelines in 1933. *See Atlas Pipe Line Co.*, 4 F. Supp. at 442. Additionally, the Beaumont court recently held, in a case where the landowner claimed the trial court lacked subject-matter jurisdiction under the same circumstances presented here, that the trial court did, indeed, have jurisdiction. *Rhinoceros*, 388 S.W.3d at 409. In this case, the trial court likewise correctly determined the matter of its own jurisdiction.

## B. The Trial Court Correctly Granted TransCanada's Motion for Summary Judgment

Crawford contends the trial court erred in granting TransCanada's motion for summary judgment.[25] This argument is based on the assertion that TransCanada failed to establish as a matter of law that it qualifies as a Texas common carrier with eminent domain authority. Crawford incorporates all arguments regarding the jurisdictional challenge, as discussed above.

---

[25]TransCanada filed a combined traditional and no-evidence motion for summary judgment. The no-evidence motion was filed on the grounds that Crawford had no evidence that TransCanada acted fraudulently, in bad faith, or arbitrarily or capriciously, failed to satisfy personal and property jurisdictional requirements and conditions precedent, made erroneous jurisdictional averments, and/or acted with gross negligence. Both motions were granted by the trial court. On appeal, Crawford contends that the trial court erred in granting TransCanada's "Motions for Summary Judgment." While Crawford recites the standard of review for a no-evidence summary judgment, the issues pertaining to this motion are not addressed or briefed. The Texas Rules of Appellate Procedure require that an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). Issues raised on appeal, but not briefed, are waived. *In re Estate of Taylor*, 305 S.W.3d 829, 836 (Tex. App.—Texarkana 2010, no pet.) (failure to cite legal authority or to provide substantive analysis of legal issues presented results in waiver of complaint); *Rammah v. Abdeljaber*, 235 S.W.3d 269, 275 (Tex. App.—Dallas 2007, no pet.). Because Crawford has failed to meet this requirement, it has waived any appellate point relating to the trial court's grant of TransCanada's no-evidence motion for summary judgment.

22

Crawford also adds a new argument, claiming that TransCanada's contemplated pipeline is not for public use.

### 1. Standard of Review

A summary judgment is reviewed de novo. *Mann v. Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The moving party has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on the issues set forth in the motion. *Id*.; TEX. R. CIV. P. 166a(c). Every reasonable inference is resolved in favor of the nonmovant, and all evidence favorable to the nonmovant is taken as true. *Nixon v. Mr. Prop. Mgmt. Co*., 690 S.W.2d 546, 548–49 (Tex. 1985).

### 2. Public Use

Article I, Section 17 of the Texas Constitution prohibits the taking of private property by eminent domain except for a "public use." The Texas Supreme Court recently determined that a pipeline company seeking to exercise the use of eminent domain must do more than transport its own product to one of its other facilities or to those of its affiliates. *Denbury*, 363 S.W.3d at 200. Instead, a pipeline company must demonstrate a reasonable probability that third-party customers will use the pipeline. *Id*. at 202.

Denbury was engaged in recovery operations that involved the transmission of carbon dioxide ($CO_2$) to be injected into existing oil wells in order to increase production. Denbury owned a naturally-occurring $CO_2$ reserve in Mississippi known as the Jackson Dome and desired to build a pipeline to deliver $CO_2$ from the Jackson Dome to Texas oil wells in order to facilitate tertiary operation on the wells. In summary judgment proceedings, Denbury submitted evidence

23

that it obtained a common carrier permit, filed a tariff, and agreed to make the pipeline available for public use. *Id*. However, the evidence also indicated that Denbury intended to transport $CO_2$ for its own consumption, with no evidence in the record of potential customers unaffiliated with Denbury. *Id*. at 203. The Texas Supreme Court disagreed with Denbury's assertion that making the pipeline available for public use is sufficient to confer common carrier status upon its owner. Instead, to qualify as a common carrier under Section 111.002(6), "a reasonable probability must exist that the pipeline will at some point after construction serve the public by transporting gas for one or more customers who will either retain ownership of their gas or sell it to parties other than the carrier." *Id.* at 202 (footnotes omitted). The court in that case determined that Denbury could not qualify as a common carrier because it failed to meet this reasonable probability test.

TransCanada disputes the applicability of *Denbury* to this situation, since it involved common carrier status under Section 111.002(6). As stated by our sister court, "we are not persuaded the Court's reasoning concerning the process of obtaining a T-4 permit applies only to carbon dioxide lines." *Crosstex NGL Pipeline, L.P. v. Reins Rd. Farms-1, Ltd.*, *No*. 09-12-00563-CV, 2013 WL 2250747, at *5 (Tex. App.—Beaumont May 23, 2013, no pet. h.) (citing *Denbury*, 363 S.W.3d at 202 n.28).[26] Even if *Denbury* should apply here, TransCanada contends, it has done all that is required under the reasonable probability test established in that case to show that it is a common carrier. We agree.

---

[26]In *Denbury*, the high court recognized that a permit by the Railroad Commission "granting common-carrier status is prima facie valid." *Denbury*, 363 S.W.3d at 202. But, "once a landowner challenges that status, the burden falls upon the pipeline company to establish its common-carrier bona fides if it wishes to exercise the power of eminent domain." *Id*.

24

The affidavit of Louis Fenyvesi, director of markets and supply for TransCanada (attached as an exhibit to TransCanada's motion for summary judgment), states that he is familiar with the Keystone Gulf Coast Project. Fenyvesi's affidavit went on to explain that the Gulf Coast Project pipeline system will commence at the crude petroleum supply hub at Cushing, Oklahoma, and will terminate at existing crude storage terminal facilities near Nederland, Texas, and Houston, Texas. The affidavit further explained that the Gulf Coast Project will transport crude petroleum owned by third-party shippers unaffiliated with Keystone or Keystone's parent companies or affiliates. In addition, an open season was held for the Cushing, Oklahoma, connection point, and various third-party shippers have committed to binding Transportation Service and Throughput Agreements (TSAs).[27] Fenyvesi's affidavit further stated that there are several binding TSAs with third-party shippers for transportation of crude petroleum on the Gulf Coast Project for an aggregate daily volume of approximately 200,000 barrels of crude petroleum per day. The third-party shippers, in accordance with the TSAs, will own the petroleum transported in the pipeline. They will not transfer title to the petroleum that will be shipped for a fee to be set forth in the tariff filed with the FERC. Fenyvesi testified that the Gulf Coast Project pipeline will be operated as a common carrier pipeline in that any shipper wishing to transport crude petroleum meeting the specifications set forth in the tariff to be filed with the FERC will have access to ship its crude petroleum. "Accordingly, Keystone will not own any crude petroleum shipped in the Pipeline; the shippers retain ownership of the crude petroleum in the Pipeline." Further, most of the companies that will ship crude petroleum

---

[27]*Glossary of Terms*, NW. ENERGY, http://www.northwesternenergy.com/display.aspx?Page=Glossary_of_Terms&Item=23#O (last visited Aug. 22, 2013).

on the Gulf Coast Project pipeline will be refiners, producers, and marketers. Per Fenyvesi, Keystone itself neither owns any refineries nor does it produce any crude petroleum. Fenyvesi testified by deposition that "we offered open to everybody a variety of contract terms. And so to the extent that a shipper signed up for a specific contract, they would be able to ship according to the rate associated with that contract." Fenyvesi's deposition, offered as summary judgment evidence, further indicates that an additional open season for the Cushing Marketlink has been held and one open season for the Bakken Marketlink Project (a separate leg of the same TransCanada oil transmission system) has been held. An uncommitted shipper will nominate volumes to ship but does not have a take-or-pay contract.

Crawford submitted no evidence to the trial court[28] to contradict or otherwise challenge the evidence of TransCanada as a common carrier "to or for the public for hire." *See* TEX. NAT.

---

[28]Crawford contends that "[e]ven [the] Federal Energy Regulatory Commission found TransCanada's practice as a contract carrier to be 'unjust, unreasonable and unduly discriminatory.'" This statement ignores the context in which the FERC's statement was made, and is, therefore, not relevant to the public use issue. TransCanada attached, as an exhibit to its motion for summary judgment, the Order on Petition for Declaratory Order issued by the FERC at the request of TransCanada. As recited in the order, TransCanada filed the petition for declaratory order:

> [R]equesting that the Commission approve the rate structure agreed to by Keystone and shippers that have signed Transportation Service Agreements (TSAs) under which they have made long-term commitments to utilize, or pay for, capacity on the Keystone pipeline system. Keystone also requests Commission approval of the methodology by which Keystone plans to design its uncommitted or "spot" rate. Finally, Keystone requests Commission approval to offer and provide a level of firm transportation, or unapportioned access, both to shippers in the United States that have signed TSAs to date and that are anticipated to sign TSAs in an upcoming open season for an expansion of the system. For the reasons discussed below, the Commission will grant in part Keystone's petition for declaratory order.

The order approved four of the five rate proposals submitted by Keystone. This was, in essence, a pre-approval process to avoid running afoul of FERC rate regulations. The FERC order thus allows Keystone the opportunity to structure its rates in compliance with applicable regulations. The order is not a determination that Keystone has violated any such regulations.

RES. CODE ANN. § 111.002(1).[29] TransCanada produced undisputed evidence, through the sworn affidavit and deposition testimony of Fenyvesi, that it will ship crude petroleum for one or more customers who will retain ownership of the oil. It has, therefore, complied with the reasonable probability test in *Denbury*. We affirm summary judgment in favor of TransCanada.

### C. No Abuse of Discretion in Partial Denial of Crawford's Fourth Motion for Continuance

Crawford complains of the trial court's partial denial of its fourth motion for continuance, claiming the need for "additional discovery and more time to adequately prepare and respond to TransCanada's summary judgment motions."

We review the decision to grant or deny a motion for continuance for an abuse of discretion. *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986); *In re A.D.A.*, 287 S.W.3d 382, 387 (Tex. App.—Texarkana 2009, no pet.). A trial court abuses its discretion "'when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002) (quoting *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985)). Here, Crawford's original counsel withdrew from the case and current counsel was substituted June 12, 2012. At the time of the substitution, trial had been previously scheduled for July 30, 2012.[30] Before ruling on the motion to withdraw, the trial court advised the parties that if the motion was granted, it would have no impact on the July trial setting. The parties both agreed to this. When current counsel

---

[29]Crawford contends that *Denbury* applies, but then ignores the reasonable probability test. Instead, Crawford submits that because TransCanada is a "contract carrier," its pipeline is not operated "for the public for hire." *Denbury* requires shipment by third-party unaffiliated shippers who retain ownership of their product or sell it to parties other than the carrier. *Denbury*, 363 S.W.3d at 202.

[30]The previous April 30, 2012, trial setting had been continued until June 13, 2012, and then to July 30, 2012.

27

filed her notice of substitution, she represented that she would not attempt to seek a continuance of the July 30 trial setting.

Despite that representation, Crawford filed its fourth motion for continuance on July 9. The trial court granted the motion with respect to Crawford's request to extend the deadlines for the filing of *Daubert* challenges and dispositive motions. Final bench trial was continued to September 4, 2012. The trial court denied the motion to the extent it requested additional time to conduct discovery, amend or supplement pleadings, or designate experts. Crawford claims that it was the duty of the court to continue the case for a sufficient length of time to permit new counsel to investigate and make a defense. As previously noted, however, Crawford expressly agreed not to seek an extension of the trial date upon substitution of counsel, at which time it was fully advised of pending deadlines. Even so, Crawford received an approximate two-month extension of the trial date.

Crawford contends that the trial court's refusal to allow additional discovery or supplemental discovery responses amounts to a clear abuse of discretion. When a motion for continuance is based on inadequate discovery, the appellate court considers the following non-exclusive factors: (1) the length of time the case has been on file, (2) the materiality of the discovery sought, and (3) whether due diligence was exercised in obtaining discovery. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004).

This case was initially filed in the trial court August 31, 2011, and was scheduled for a bench trial September 4, 2012. The parties had almost one year to complete discovery. Counsel for Crawford explained that previous trial counsel did very little trial preparation. Instead, "It

was all just . . . work on settlement, to get the largest settlement possible, to coerce his client [(Crawford)] into taking the settlement so this would never go to trial." Counsel further explained to the trial court that she would like to serve TransCanada with requests for production of documents to verify certain TransCanada documents that were prepared and produced in a similar case and that this could take at least forty-five days. In addition, Crawford wished to depose Texas Railroad Commission engineer technician, Kathy Arnold, regarding the implications of her October 21, 2008, letter to TransCanada (to which reference has been previously made) regarding interstate operations. Counsel for Crawford substituted in this case over thirty days prior to the hearing on the motion for continuance. Yet, the discovery claimed to be needed at the hearing had not been previously requested. Nothing in the record indicates that counsel had attempted to schedule Arnold's deposition. The record is devoid of a request for production of documents to TransCanada, seeking the documents counsel mentioned at the continuance hearing.[31]

We know, in hindsight, that the documents from the *Rhinoceros* case were not material. On very similar arguments, that case went against Crawford on all issues. Crawford makes no argument as to why Arnold's deposition was material to its claims or defenses. Even though counsel was only on board for thirty days prior to the continuance hearing, counsel knew in advance of the hearing that she wished to request the referenced documents and deposition. Due diligence is questionable here. Taking into account that there is scant evidence of the materiality of the content of the desired deposition and the lack of due diligence, together with the extension

---

[31]Nevertheless, counsel for Crawford worked diligently with counsel for TransCanada in scheduling four additional depositions requested by TransCanada in June 2012.

of the pretrial and trial dates, the trial court's denial of additional time in which to conduct discovery was not an abuse of discretion.

## III.    Conclusion

We affirm the judgment of the trial court.


Bailey C. Moseley
Justice

Date Submitted:     July 30, 2013
Date Decided:       August 27, 2013