# IN THE SUPREME COURT OF TEXAS

═══════════
No. 15-0687
═══════════

ETC Marketing, Ltd., Petitioner,

v.

Harris County Appraisal District, Respondent

═══════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the First District of Texas
═══════════════════════════════════════════════════

**Argued December 6, 2016**

Justice Devine delivered the opinion of the Court, in which Justice Green, Justice Johnson, Justice Willett, Justice Lehrmann, Justice Boyd, and Justice Brown joined.

Justice Brown filed a concurring opinion, in which Justice Willett joined.

Chief Justice Hecht filed a dissenting opinion.

Justice Guzman did not participate in the decision.

The Commerce Clause of the United States Constitution limits a state's power to tax interstate commerce. But this limit is not all-encompassing, and states may tax some property despite its interstate character. This case requires us to determine whether those constitutional limits bar property taxes levied on natural gas stored in Texas while awaiting future resale and shipment to out-of-state consumers.

We are not the first to address this question. The Oklahoma and Kansas Supreme Courts found taxation of stored gas constitutional under similar circumstances. *See In re Assessment of*

*Personal Prop. Taxes Against Mo. Gas Energy, a Div. of S. Union Co. for Tax Years 1998, 1999, and 2000*, 234 P.3d 938, 959 (Okla. 2008) [hereinafter *Missouri Gas*]; *In re Appeals of Various Applicants From a Div. of Prop. Valuation of Kan. for Tax Year 2009 Pursuant to K.S.A. 74-2438*, 313 P.3d 789, 799 (Kan. 2013) [hereinafter *Kansas Gas*]. The court of appeals likewise found the tax valid in this case. *See* 476 S.W.3d 501, 513 (Tex. App.—Houston [1st Dist.] 2015). But the dissenting justice and one other court of appeals saw the issue differently, finding that the Commerce Clause forbids the taxation at issue. *See id.* at 523 (Keyes, J., dissenting); *Peoples Gas, Light, and Coke Co. v. Harrison Cent. Appraisal Dist.*, 270 S.W.3d 208, 219 (Tex. App.—Texarkana 2008, pet. denied). Although Texans and Oklahomans may disagree from time to time[1], our Supreme Courts agree, at least, on this: a nondiscriminatory tax on surplus gas held for future resale does not violate the Commerce Clause. The judgment of the court of appeals is affirmed.

## I. Background

ETC Marketing, Ltd. buys and sells natural gas. ETC purchases gas at the Katy marketing hub, which is located in Texas. And ETC immediately entrusts that gas to its affiliate, Houston Pipe Line Company (HPL), a pipeline operator authorized by the Federal Energy Regulatory Commission (FERC) to transport gas. HPL's pipeline system does not extend beyond the borders of Texas but does connect to several other interstate pipelines. This interstate connection allows ETC to market and sell gas across the country.

---

[1] *See Cardoni v. Prosperity Bank*, 805 F.3d 573, 576 n.1–2 (5th Cir. 2015) (chronicling the clashes between the states on issues ranging from boundary disputes to football rivalries) (citations omitted).

Once injected into the pipeline, ETC's gas commingles with other gas, making tracking the exact location of certain gas molecules impossible. To overcome this dilemma, ETC and HPL allocate ownership of stored gas on paper. When ETC orders HPL to ship a certain volume of gas downstream, the volume of gas shipped is subtracted from ETC's total allocated amount.

Central to this dispute is the storage of ETC's gas. HPL stores ETC's gas at the Bammel facility in Harris County. The Bammel facility, which HPL owns and operates, connects to HPL's pipeline system and is located atop the Bammel reservoir. That reservoir lies under several thousand acres and holds a vast amount of natural gas. In order to create the pressure necessary to pump gas in and out of the reservoir, HPL maintains a permanent supply of "cushion gas" in the facility. HPL pays ad valorem taxes on that cushion gas and on the Bammel facility itself. But HPL does not pay taxes on stored gas owned by marketers like ETC.

ETC purchased a dedicated storage capacity in the Bammel reservoir from HPL. The resulting storage agreement between the two parties is authorized by Section 311 of the Natural Gas Policy Act. Pursuant to the agreement, HPL pumps ETC's excess gas (gas that exceeds the pipeline's capacity) into the reservoir. There, the gas remains while it awaits orders from ETC to ship certain volumes to downstream consumers. This storage capacity allows ETC to maintain a surplus of gas on the pipeline system so that it can better satisfy future demand and "time the market" during peak periods. As demand rises and falls, the volume of stored gas fluctuates accordingly. Specifically, ETC begins to accumulate gas in April and effectively sells all of the accumulated gas by the end of the winter season. ETC thus maintains a seasonal—though not year-round—presence of gas in the reservoir. Although ETC intends to and does sell a majority of this

3

stored gas outside Texas, it is not obligated to do so. Rather, ETC can sell the gas outside Texas, within Texas, or not at all.

This taxing saga began in September 2009[2], when the Harris County Appraisal District (HCAD) appraised the value of approximately 33 billion cubic feet of gas allocated to ETC and stored in the Bammel reservoir. HCAD then assessed ad valorem taxes on the value of that gas for the 2010 tax year. ETC protested the tax to the Harris County Appraisal Review Board on the basis that the stored gas was in the stream of interstate commerce and therefore immune from taxation.

After the Review Board denied ETC's challenge, ETC appealed to the district court. There, both ETC and HCAD filed motions for summary judgment. ETC relied again on the protections of the Commerce Clause. HCAD countered that the stored gas was not in the stream of interstate commerce, and even if it was, the tax was valid under all four prongs of the Supreme Court's holding in *Complete Auto Transit, Inc. v. Brady*, which supplies the test for determining the constitutionality of state taxation of interstate commerce. 430 U.S. 274, 279 (1977). The district court granted HCAD's motion and denied ETC's motion, and ETC appealed. The court of appeals affirmed, assuming the gas was in interstate commerce but agreeing with HCAD that the tax satisfied *Complete Auto*. *See* 476 S.W.3d at 513. One justice dissented, finding "no material distinction between this case and *Peoples*," which, on similar facts, found the ad valorem tax violated *Complete Auto*. *Id.* at 517 (Keyes, J., dissenting); *see also Peoples*, 270 S.W.3d at 219. We granted ETC's petition for review.

---

[2] The default appraisal date for ad valorem taxes is January 1 of the tax year. TEX. TAX. CODE § 23.01. But the Tax Code also gives most owners of inventory the option to use September 1 from the preceding year as an alternative appraisal date. *Id.* § 23.12(f). ETC chose a September appraisal.

4

## II. The Texas Tax Code

The centerpiece of this dispute is the Commerce Clause. But there is another issue at play—whether the Texas Tax Code provides an independent shield against taxation. Two provisions of the Code are of particular importance.[3] First, the state can tax only personal property "located in this state for longer than a temporary period." TEX. TAX CODE § 11.01(c)(1). Likewise, a taxing unit may tax only property "located in the unit on January 1 for more than a temporary period." *Id.* § 21.02(a)(1) (also known as the "taxable situs" requirement). Taking these provisions together, ETC argues that because its stored gas is not located in Texas for longer than a "temporary period," neither Texas nor HCAD can tax the gas.

ETC cautions that we must address these issues of Texas law first under well-recognized principles of constitutional avoidance. ETC is, of course, correct that we will "only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds." *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003). But in doing so, we remain subject to our procedural rules, such as those governing preservation of error. On that front, HCAD contends ETC waived its temporary-period argument in the trial court. We agree.

In its motion for summary judgment, ETC listed the following two grounds for recovery:

> 1) the property is exempt from taxation as it is in the stream of interstate commerce; and
>
> 2) Harris County Appraisal District does not have jurisdiction to appraise the property since the taxing units served by the Appraisal District are without jurisdiction to tax the property.

---

[3] ETC relies also on Section 11.12, which ensures that "[p]roperty exempt from ad valorem taxation by federal law is exempt from taxation." TEX. TAX CODE § 11.12. Our conclusion on the constitutional question will necessarily control our conclusion on this Tax Code exemption.

5

ETC argues that the second of these grounds preserved its temporary-period argument. HCAD counters that ETC's motion did not mention "temporary period," cite the relevant statutory provisions, or discuss anything other than the applicability of the Commerce Clause.[4] There was nothing in the motion, HCAD says, to point the trial judge to the statutory sections ETC now invokes.

To preserve error a party must present "the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). And to obtain summary judgment, a movant must "state the specific grounds" entitling it to summary judgment. TEX. R. CIV. P. 166a(c). Undergirding these rules is the principle that the trial court should have the chance to rule on issues that become the subject of the appeal.

The only sentence from ETC's motion that could possibly preserve its temporary-period argument is the statement outlining ground two: "Harris County Appraisal District does not have jurisdiction to appraise the property since the taxing units served by the Appraisal District are without jurisdiction to tax the property."[5] The body of the motion, the prayer for relief, and the accompanying affidavits were devoted entirely to discussion of the Commerce Clause. Though ETC does not say so expressly, implicit in its argument is the concept that "jurisdiction to tax" must

---

[4] There is no dispute that ETC's reliance on Section 11.12 (the state-law exemption for taxes prohibited by federal law) is preserved. ETC referenced this exemption numerous times. In fact, the exemption was the only Tax Code provision cited in ETC's motion.

[5] ETC argues alternatively that by citing *Midland Central Appraisal District v. BP American Production Co.*, 282 S.W.3d 215 (Tex. App.—Eastland 2009, pet. denied), it preserved the temporary-period argument. Not so. Though *Midland* did involve a discussion of the temporary-period requirement, ETC mentioned *Midland*'s analysis of the Commerce Clause and nothing else. When reading ETC's motion for summary judgment, the trial judge would have had no idea *Midland* dealt with the Texas Tax Code at all. A citation to one topic in a case does not preserve every issue discussed therein.

6

necessarily point to the sections of the Tax Code containing the temporary-period requirement. True, Section 11.01(c)(1) does speak of the temporary-period requirement in jurisdictional terms. Tᴇx. Tᴀx. Cᴏᴅᴇ. § 11.01(c)(1) (explaining that the "state has jurisdiction to tax" personal property "located in this state for longer than a temporary period"). But though a reference to taxing jurisdiction *can* refer to the temporary-period requirement, it does not mean that ETC's motion used the term for that purpose. After all, jurisdiction "'is a word of many, too many, meanings.'" *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 305 (Tex. 2010) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998)).

Which of the many meanings did ETC use as the basis for its motion? The answer is in the motion itself, where ETC provided a decidedly federal explanation for the term:

> [I]f Federal law makes a thing exempt from taxation, any inconsistent state law, or one which 'impedes' the free movement of commerce among the several states just yield, thus depriving the State (and any of its various political subdivisions, such as [the appraisal district]) of jurisdiction to tax or attempt to tax that which Federal law deems non-taxable by the States.

This passage—which contains the only other mention of jurisdiction in the motion—clears up all ambiguity about ETC's use of the term. ETC articulated that federal law (the Commerce Clause), not the Texas Tax Code, deprived HCAD of jurisdiction. To hold otherwise would require us to assume the trial judge ignored the movant's own explanation of the term. ETC cannot devote an entire motion to one federal argument and seek to argue a distinct state-law position on appeal by relying on a term that is ambiguous in isolation. Context matters. And in the context of this motion there is no question that ETC failed to present the temporary-period ground at all, let alone specifically. Accordingly, ETC waived any complaint on appeal involving Sections 11.01(c) and 22.01(a) of the Tax Code. *See D.R. Horton-Tex., Ltd. v. Markel Intern. Ins. Co., Ltd.*, 300 S.W.3d

7

740, 743 (Tex. 2009) ("In summary judgment practice, 'issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal.'") (quoting TEX. R. CIV. P. 166a(c)).

### III. The Commerce Clause

The Commerce Clause gives Congress authority to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Though written as an affirmative grant of authority, the clause also limits the power of states to interfere with interstate commerce. *See Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995) (explaining that this inverse effect is known as the "dormant Commerce Clause"). The challenge before us squarely implicates that limit in the context of state taxation.

*Complete Auto* provides the most recent test for determining whether a state tax violates the Commerce Clause. *D.H. Holmes Co. v. McNamara*, 486 U.S. 24, 30 (1988) (citing *Complete Auto*, 430 U.S. at 288). If the tax implicates interstate commerce, the tax must meet four necessary conditions to withstand constitutional scrutiny. *McNamara*, 486 U.S. at 30. The tax must: (1) apply to an activity with a substantial nexus with the taxing state; (2) be fairly apportioned; (3) not discriminate against interstate commerce; and (4) be fairly related to the services provided by the state. *Id.* The Court has clarified how to apply the latter three prongs, but provided little insight into what constitutes a "substantial nexus."

Another issue that remains unclear is to what extent the *Complete Auto* test supplanted the traditional method for determining whether state taxation was proper: the "in transit" test. The test was simple. If property was in transit, it was not taxable because it was in interstate commerce. *Minnesota v. Blasius*, 290 U.S. 1, 9 (1933). On the other hand, property that lacked continuity of

8

transit was fully taxable because it was considered outside interstate commerce entirely. *Id.* This litmus test had a particularized application in cases (like the present one) involving property stopped during the course of an otherwise interstate journey. *See id.* at 12 (explaining that the purpose of the stoppage was central to determining whether property remained in transit). Though the Court later explained that *Complete Auto* "abandoned the abstract notion that interstate commerce 'itself' cannot be taxed by the State," *McNamara*, 486 U.S. at 30, the Court remains silent on whether the in-transit test has any remaining vitality within the modern approach.

A synthesis of the frameworks may be proper. *See Diamond Shamrock Ref. & Mktg. Co. v. Nueces Cty. Appraisal Dist.,* 876 S.W.2d 298, 302 (Tex. 1994). In *Diamond Shamrock*, we addressed a Commerce Clause challenge to taxation of imported oil. *Id.* at 298. In applying *Complete Auto*, we noted that "the circumstances which make the goods 'in transit' may inform a court's decision that the [substantial nexus and fair relation] requirements of *Complete Auto* are not met." *Id.* at 302. The court of appeals in this case similarly reconciled the two tests. *See* 476 S.W.3d at 509 n.16. And both ETC and HCAD seem to agree with that methodology. We see no reason to stray from this approach.

### A. Is the Gas in Interstate Commerce?

The court of appeals assumed without deciding that the stored gas at the Bammel facility was in interstate commerce. 476 S.W.3d at 508. So did the Kansas and Oklahoma Supreme Courts when faced with nearly identical storage arrangements. *See Kan. Gas*, 313 P.3d at 796–97 (moving immediately to analysis under *Complete Auto* without addressing the threshold question); *Mo. Gas*, 234 P.3d at 953–54 (similarly skipping the threshold question). Before doing the same and diving headlong into *Complete Auto*, HCAD urges us to entertain the possibility that the gas is not in

9

interstate commerce at all.  HCAD points us to cases predating *Complete Auto* that apply the in-transit test.  *See, e.g., Blasius*, 290 U.S. at 12; *Bacon v. Illinois*, 227 U.S. 504, 515–16 (1912).  In those cases, the Court treated property that was not in transit as outside interstate commerce entirely. *See Blasius*, 290 U.S. at 9–10.  HCAD stresses ETC's business purpose in storing the gas for future resale as indicating a lack of continuity of transit.  *See id.* at 10 (explaining that property is not in transit when it "has come to rest within a state, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the state, or for shipment elsewhere, as his interest dictates").  Because ETC's gas was not in transit, HCAD posits, it was outside the stream of interstate commerce such that we need not reach *Complete Auto*.

Though HCAD's one-step approach (no transit equals no interstate commerce) may have been proper under the Supreme Court's old methodology, the Court's new approach casts doubt on that assumption.  Under *Complete Auto*, we must effectively conduct two distinct inquiries: (1) whether the tax implicates interstate commercial activity and, if so, (2) whether the tax satisfies all four prongs.  *See Jefferson Lines*, 514 U.S. at 183 (citing *Complete Auto*, 430 U.S. at 287–88). As mentioned above, the in-transit issue plays a vital role in the second part of that test—specifically, the substantial-nexus prong.  *See Diamond Shamrock*, 876 S.W.2d at 302.  Utilizing an inquiry during the second step of the sequence that is dispositive on the first would make little sense.[6]  This practical hurdle aside, *Maryland v. Louisiana*, 451 U.S. 725, 754–55 (1981), a case decided under the modern framework, militates against HCAD's conclusion.

---

[6] Of course, there may be some (if not many) cases in which property is outside the stream of interstate commerce and would likewise not be in transit (were a court to reach that issue).  We conclude simply that a finding of the latter does not guarantee the former.

10

In *Maryland*, the Court addressed whether a Louisiana first-use tax on natural gas violated the Commerce Clause. *Id.* at 728. Before reaching the *Complete Auto* prongs, the Court noted:

> [I]t is clear to us that the flow of gas from . . . wells, through processing plants in Louisiana, and through interstate pipelines to the ultimate consumers in over 30 states constitutes interstate commerce. . . . But although Louisiana "uses" may possess a sufficient local nexus to support otherwise valid taxation, we do not agree that the flow of gas from the wellhead to the consumer, even though interrupted by certain events, is anything but a continual flow of gas in interstate commerce. Gas crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey.

*Id.* at 754–55. This passage settles the threshold debate. When making the initial interstate-commerce determination, the Court did not analyze whether the gas was "in transit" by looking to the character of the interruptions. Instead, the Court saw gas placed in an interstate pipeline system and summarily found interstate commerce. *Id.* To the extent the Court's holding in *Maryland* is at odds with statements from older in-transit cases, we heed the Court's advice for dealing with a possible inconsistency: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [the lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). *Maryland* is on point, and we apply it to the facts at hand.

ETC places its gas (some of which comes from out of state) in the HPL system, an intrastate pipeline that is connected to an interstate pipeline network. HPL eventually conveys a majority of the gas through those pipelines to ETC's out-of-state customers downstream. As a result, ETC's gas enters interstate commerce. *See Maryland*, 451 U.S. at 755. *Maryland* requires nothing more. The circumstances of ETC's storage—though critical to our later analysis—do not control at the outset.

**B.      The *Complete Auto* Test**

Having found the gas in interstate commerce, we turn now to the four prongs of *Complete Auto*.

**1.      Substantial Nexus**

The first prong of the test requires us to determine whether ETC's gas has a substantial nexus with the taxing state. *McNamara*, 486 U.S. at 30. The purpose of this prong is to "limit the reach of state taxing authority so as to ensure that state taxation does not unduly burden interstate commerce." *Quill Corp. v. North Dakota*, 504 U.S. 298, 313 (1992). In effect, a state "will not be able to exact a fee simply for the privilege of passing through the state." *Mo. Gas*, 234 P.3d at 965. Vital to this question—and muddying the analysis of courts below—is the issue of precisely what must bear a substantial nexus to the state. *See* 476 S.W.3d at 508–09; *Peoples Gas*, 270 S.W.3d at 218. Is it the property, the taxpayer, or both? We must first dispel the confusion.

In coming to different conclusions on the first prong, the court of appeals in this case and the court in *Peoples* both gave special significance to the physical presence of the taxpayer in the state. *See* 476 S.W.3d at 508–09 ; *see also Peoples Gas*, 270 S.W.3d at 218. Finding no substantial nexus, the *Peoples* court stressed, "[The taxpayer] maintains no office in Texas. Nor does it have any employees, representatives, or physical facilities in the State." 270 S.W.3d at 218. The court of appeals here, in distinguishing *Peoples*, emphasized that "ETC Marketing had offices and employees in Harris County and elsewhere in the state of Texas." 476 S.W.3d at 508. These distinctions may be among the quintessential due-process considerations of personal jurisdiction—i.e., a defendant's so-called "minimum contacts" with a state. But they are irrelevant to this Commerce Clause challenge.

12

The Supreme Court has instituted a physical-presence test for Commerce Clause challenges only in the realm of sales and use taxes, but it has refused to do so in other cases. *See, e.g., Quill Corp.*, 504 U.S. at 315; *Nat'l Bellas Hess, Inc. v. Dep't of Revenue*, 386 U.S. 753, 757 (1967). More generally, the Commerce Clause requires "some definite link, some minimum connection, between a state and the person, property, or transaction it seeks to tax." *Allied-Signal, Inc. v. Dir., Div. Of Taxation*, 504 U.S. 768, 777 (1992) (citing *Miller Bros. Co. v. Maryland*, 347 U.S. 340, 344–45 (1954)). We must therefore examine what the Texas ad valorem scheme "seeks to tax." *Allied-Signal*, 504 U.S. at 777.

Though a municipality collects ad valorem taxes from the coffers of the tax-paying business, the tax is levied on property located in the jurisdiction. It is, after all, a property tax. *See* TEX. TAX CODE § 11.01(c) (explaining that the state generally has "jurisdiction to tax tangible personal property"). So long as the property qualifies, the ad valorem tax does not care whether a taxpayer is located in the taxing unit, the state, or the country for that matter. Nor does the Commerce Clause. When dealing with ad valorem taxation, therefore, the link between the property and the state is the relevant consideration. *Allied-Signal, Inc.*, 504 U.S. at 777. To the extent *Peoples* and the court of appeals relied on the taxpayer's physical presence (or lack thereof), such reliance was misplaced.

Having determined the proper scope of the inquiry, we turn now to whether the gas here bears a satisfactory connection to Texas. We reiterate the importance of injecting the in-transit test at this juncture. The Kansas and Oklahoma Supreme Courts, when tasked with applying the first prong of *Complete Auto* to a similar set of facts, did not find application of the in-transit test to be dispositive but concluded instead that the gas bore a substantial nexus to the respective states based on the objective fact that the gas was stored in the state for a substantial period of time. *See Kan. Gas*, 313

13

P.3d at 799; *Mo. Gas*; 234 P.3d at 955 (explaining that because the in-transit test's "subjective factors are inconclusive, the nexus issue is better decided on the basis of the objective fact that [the pipeline] stored gas on behalf of [the taxpayer] and that a certain amount of it was held [in storage] at all times during the tax years in question").

Though the mere presence of gas in the taxing jurisdiction is surely the starting point for the substantial-nexus inquiry, it is not the end of the road. Indeed, a presence-based rule, standing alone, would allow a state to tax gas "merely passing through" the state on the taxing day—an outcome the Commerce Clause does not tolerate. *Mo. Gas*, 234 P.3d at 955. Nor is it tenable to put dispositive weight on the length of time property stays within the confines of a jurisdiction. Doing so would require us to answer a series of unanswerable questions. How long is long enough? Several months? Year round?[7] Our answer to that question would be inherently arbitrary. Instead, the in-transit test provides a more nuanced approach for determining whether property is sufficiently connected to the state while adding a measure of predictability that the presence-plus-time approach lacks.

So, with the in-transit line of cases in mind, we summarize the relevant law and apply it to ETC's stored gas. We pay special attention to cases establishing a framework for dealing with property that stops in a state amidst an otherwise interstate journey. On one side of the spectrum are cases involving a clearly transitory stop. *See, e.g., Champlain Realty Co. v. Town of Brattleboro*, 260 U.S. 366, 373 (1922) (finding continuity of transit when logs shipped interstate stopped due to

---

[7] In *Missouri Gas*, the court did not have to engage in any line drawing because a certain amount of the gas was held at the facility "at all times during the tax years in question." 234 P.3d at 955. Here, ETC's gas is present on a seasonal basis—not year round. Thus, the line-drawing issue would be inescapable were we to go the "objective fact" route taken in *Missouri Gas*. *Id.*

14

an impasse created by the frozen river); *Kelley v. Rhoads*, 188 U.S. 1, 8–9 (1903) (finding continuity of transit when a heard of sheep transported from Utah to Nebraska would take intermittent stops to graze); *Carson Petroleum Co. v. Vial*, 179 U.S. 95, 107–09 (1929) (finding continuity of transit when oil stopped while awaiting the eventual return of its transport vessel). These decisions illustrate that stoppage integral to the journey itself is really no stoppage at all in the eyes of the Commerce Clause. *See Blasius*, 290 U.S. at 9–10 (explaining that "[t]emporary interruptions due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement" do not break continuity of transit). ETC urges us to analogize between these cases and the present one because gas storage is necessary to facilitate safe and efficient interstate transportation.

HCAD argues cases on the other end of the spectrum are more analogous. These cases invariably contain a stoppage for some other (usually business-centric) purpose. *See, e.g., id.* at 12 (finding that cattle shipped to Minnesota from out of state were no longer in transit once held in Minnesota for future interstate resale); *Bacon*, 227 U.S. at 516 (finding that grain held in Chicago for processing was no longer in transit even though the taxpayer intended to send the grain to another state); *Coe v. Town of Errol*, 116 U.S. 517, 528–29 (1886) (finding that logs held in New Hampshire were not in transit despite the taxpayer's intention to ship the logs to Maine). Resonating from these cases is the following principle:

> Where property has come to rest within a state, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the state, or for shipment elsewhere, as his interest dictates, it is deemed to be a part of the general mass of property within the state and is thus subject to its taxing power.

15

*Blasius*, 290 U.S. at 10. HCAD proposes that ETC's storage is akin to these nontransitory stops because ETC holds the gas for future resale and disposition.

Starting with the cases finding continuity of transit, *Carson Petroleum* bears perhaps the closest resemblance to the current scenario; both cases involve oil or gas that is stopped awaiting transport to a final destination. 279 U.S. at 98–99. But the in-transit test does not view interruptions in a vacuum. Instead, we must examine why the stoppage takes place. *Bacon*, 227 U.S. at 516–17. With that touchstone in mind, the differences between *Carson Petroleum* and this case become manifest. In *Carson Petroleum*, a shipper unloaded oil from trains and stored the oil in tanks at a port to await the arrival of seafaring vessels. 279 U.S. at 99. Storage was therefore necessary because there was no vehicle ready to continue the journey when the oil arrived at the dock. *See id.* at 108–09. Said differently, the oil in *Carson Petroleum* was part of a disjointed system of transit, making the accumulation of oil at Point A an inevitability of the continuous (albeit delayed) journey to Point B. *See id*. (explaining that "the delay in transshipment was due to *nothing* but the failure of the arrival of the subject to be shipped at the same time as the arrival of the ships at the port of transshipment") (emphasis added).

No such transport dilemma exists here. Natural-gas transportation does not involve the disjointed, moving pieces found in *Carson Petroleum*. Quite the opposite; HPL's storage facility and pipeline are, at all times, connected to an interstate pipeline system. But ETC does not utilize this fixed means of transportation for months at a time, choosing instead to entrust massive quantities of gas to HPL for extended storage and eventual transportation. Thus, ETC's gas, unlike the oil in *Carson Petroleum*, is not paused in anticipation of the return of its only means of transportation. 279 U.S. at 108–09. Rather, the gas awaits ETC's *decision* to order shipment via

16

an already-available mode of transportation. After all, the lack of a precommitted destination is precisely why the gas must stop; it has nowhere to go while awaiting ETC's shipment orders. If ETC's gas were viewed in terms of *Carson*'s oil, it would be as if the oil shipper turned the captain of the returning vessel away empty handed in hopes of selling the oil after future demand rose. As such, ETC's storage facilitates anything but "speedy and continuous export": it delays transportation until a later, more profitable date. *Carson Petroleum*, 279 U.S. at 109 (explaining that facilitating "speedy and continuous export" is a reason that furthers continuity of transit).

Rather, the gas storage here mirrors stoppages in cases finding a lack of continuity. Again, those cases stress that property shall not be considered in transit when it "has come to rest within a state, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the state, or for shipment elsewhere, as his interest dictates." *Blasius*, 290 U.S. at 10. That descriptor fits this case perfectly. ETC, through HPL, holds the taxed gas in Texas for eventual resale and final transportation. ETC has full discretion to decide when and where to deliver its gas. Though ETC intends to sell most of its gas outside Texas, the Commerce Clause does not give controlling effect to a property owner's future plans. *See Bacon*, 227 U.S. at 303 (explaining that the "intention of the owner to send [property] to another state" is not controlling); *Blasius*, 290 U.S. at 9 ("If the interstate movement has not begun, the mere fact that such a movement is contemplated does not withdraw the property from the state's power to tax it."). Instead, that ETC's gas may be sold in state or out of state (or not at all) is the relevant fact, and it is one that weighs decidedly against continuity of transit. *Blasius*, 290 U.S. at 10; *see also Va. Indo. Co. v. Harris Cty. Appraisal Dist.*, 910 S.W.2d 905, 912 (Tex. 1995) (explaining that "if goods are delayed for the purpose of . . . storage pending receipt of orders," we do not consider the goods in transit).

17

This case bears a close resemblance to the scenario in *Federal Compress & Warehouse Co. v. McLean*, 291 U.S. 17 (1934). *McLean* dealt with cotton stored in a warehouse before its eventual resale and shipment out of state. *Id.* at 19–20. The owner of the cotton entrusted it to the warehouse operator, who gave the owner a receipt in return. *Id.* at 19. Though the warehouse operator exercised physical control over the cotton, the owner could direct the warehouse operator to deliver certain amounts of cotton to a rail carrier for interstate transportation. *Id.* at 19–20. These facts mirror ETC and HPL's entrustment relationship. As a result, *McLean*'s following in-transit analysis is highly persuasive in the present case:

> It is clear that by all accepted tests the cotton, while in [the] warehouse, has not begun to move in interstate commerce, and hence is not a subject of interstate commerce immune from local taxation. When it comes to rest there, its intrastate journey, whether by truck or by rail, comes to an end, and, although in the ordinary course of business the cotton would ultimately reach points outside the state, its journey interstate does not begin, and so it does not become exempt from local tax until its shipment to points of destination outside the state. Before shipping orders are given, it has no ascertainable destination without the state, and in the meantime, until surrender of the warehouse receipts, it is subject to the exclusive control of the owner. Property thus withdrawn from transportation, whether intrastate or interstate, until restored to a transportation movement interstate, has often been held to be subject to local taxation.

*Id.* at 21. This analysis[8] lends further support to the conclusion that ETC's gas is not in transit.

*McLean* serves another important function in this case; it belies ETC's argument that HPL's physical control of the gas means ETC cannot possess a business purpose with respect to storage. Specifically, ETC argues it is HPL (if anyone) who derives a business purpose from the storage. But *McLean*—which identified the stored cotton as not in transit—dealt with this exact same entrustment scenario and made no such distinction. *See id.* at 19. Consequently, the Supreme Court has made

---

[8] We recognize again that a lack of transit used to mean a lack of interstate commerce. As such, we give weight to the Court's in-transit analysis, not its conclusion about the existence of interstate commerce in the first instance.

no indication that an in-transit determination hinges on which party exercises physical control over the property.

ETC's control-versus-ownership distinction is weakened further when we examine its business arrangement with HPL. HPL transports and delivers gas at the behest of ETC. ETC made the decision to purchase storage capacity from HPL. In turn, HPL's decision to act on that storage arrangement by storing gas can hardly come as a surprise to ETC. Rather, storage is the inevitable and intended consequence of ETC's business practice—injecting more gas than customer demand will support. The gas has to go somewhere. If HPL did not store the gas, it would necessarily flow downstream only to find a complete lack of paying customers on the other end: a problematic (and business backwards) result for ETC indeed. The record simply does not support ETC's contention that it does not willfully participate in and benefit from this practice of storage. We thus reject the notion that HPL's physical control of gas diminishes ETC's business purpose. To adopt such a rule would functionally immunize gas owners from a property tax based on the handling of the gas by a third party. Neither case law nor common sense supports that result.

ETC argues further that excessive reliance on its profit-based motive threatens to render the substantial-nexus inquiry a nullity. After all, ETC says, what for-profit taxpayer does not serve a business purpose with every choice it makes? But if ETC's fears were justified (they are not), the many decisions of the Supreme Court would reflect a business-purpose finding in every case involving a for-profit taxpayer (they do not). Alas, ETC cites case after case in which the Supreme Court found continuity of transit despite the taxpayer deriving some economic benefit from completing the journey. *See, e.g., Kelley*, 188 U.S. at 8 (involving the transport and delivery of sheep); *Carson Petroleum*, 279 U.S. at 109 (involving the delivery of oil to foreign buyers). These

cases illustrate that a merely incidental desire to make a profit will not subvert a true transportation-related stoppage. Here, ETC's business purpose—to create and maintain a surplus so as to time the market—was not an afterthought. It was the very impetus for the lengthy storage.

The foregoing discussion tips the scale toward a finding that the stored gas is not in transit and thus has a substantial nexus with Texas.

But we are not done. ETC, the aligned *amici*, and the dissent offer several more arguments invoking allegedly unique characteristics of natural-gas transportation. These characteristics, they say, make storage a necessary component of the natural-gas transportation scheme such that ETC's storage does not break continuity of transit. First, ETC explains that storage is necessary to preserve an adequate supply of gas as demands rise and fall throughout the year. But this argument is self-defeating because it points to a reason we have already recognized as being a business, not transportation, purpose: creation of a surplus to meet fluctuating consumer demands. *See Calvert v. Zanes-Ewalt Warehouse, Inc.*, 502 S.W.2d 689, 693 (Tex. 1973) (recognizing that "the accomplishment of regular and dependable delivery to . . . customers . . . by means of [a] pool maintained in [a] warehouse" was a "business advantage," not a transportation-related purpose, in the eyes of the Commerce Clause). If it were the other way around, could not every dealer of surplus inventory avoid taxes by claiming this purpose as their own?

Also invalid is ETC's second reason: natural-gas storage is necessary because when demand is low, excess gas must be removed from the pipeline so as to control pipeline pressure and maintain structural integrity. This storage, urges ETC, functions to ensure safe, convenient transportation by limiting interference with operation of the pipeline itself. *See Va. Indon. Co.*, 910 S.W.2d at 912 (explaining that stoppages "due to the necessities of the journey for the purpose of safety and

20

convenience in the course of the movement" do not break continuity of transit) (quoting *Blasius*, 290 U.S. at 9–10). In addressing this proffered reason, we first recognize what it is not. ETC's explanation is not that the pipeline is overcrowded and that its gas is predestined by shipping orders for out-of-state travel, only stopping until space in the pipeline becomes available. That reason would more closely resemble the export scenario in *Virginia Indonesia. See* 910 S.W.2d at 912 (engaging in an in-transit analysis under the import-export clause, a distinct but analytically related constitutional question). There we found continuity of transit when goods precommitted to a foreign destination had to stop in order to undergo a prerequisite customs check. *Id.* In other words, the goods in *Virginia Indonesia* stopped only as long as necessary to resume their predetermined journey: they had to wait their turn. *Id.* at 913–14 (explaining that the goods stopped to "undergo only those procedures . . . required for exportation"). ETC does not make that argument here, nor can it on this record. ETC's gas does not resume transportation as soon as space becomes available; ETC orders transportation when the demand rises and it so decides the market conditions are most advantageous. *See, e.g. Calvert*, 502 S.W.2d at 693 (explaining that delaying transportation to better meet future demand does not render a stoppage transitory).

Instead, ETC's argument is that its storage allows the pipeline *itself* to remain open for gas to flow freely. For this proposition, ETC cites *Schneidewind v. ANR Pipeline Co.*—a case dealing with the scope of FERC's regulatory authority. *See* 485 U.S. 293, 295 n.1 (1988) ("Underground gas storage facilities are a necessary and integral part of the operation of piping gas from the area of production to the area of consumption.") (quotations and citations omitted). Though this rationale is undeniably related to transportation in a general sense, it again misses the mark by misunderstanding the in-transit test. Common to a finding of continuity is the idea that the stoppage

is necessary to transportation. But necessary for the transportation of what? The storage must facilitate the journey of the stopped property itself. *See Blasius*, 290 U.S. at 9–10 (emphasizing the importance of "[t]emporary interruptions due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement"); *Kelley*, 188 U.S. at 8–9 (stoppage and grazing of sheep was necessary so that the grazing sheep would survive the journey); *Champlain Realty Co.*, 260 U.S. at 373 (stoppage of logs was necessary to avoid subjecting the stopped logs to a dangerous and inefficient journey through ice and high waters). Yet ETC's seasonal storage is not a prerequisite to safe, effective movement of the stored gas but instead clears the way for the pipeline to transport other gas.

There is a good reason why the cited cases zero in on interruptions that facilitate transportation of the stopped goods and not transportation generally: removal of property from a channel of interstate commerce always has the coordinate effect of clearing the channel for other property to travel. If that coordinate effect were enough to render a stoppage transitory, it would call into question the taxability of a host of circumstances we thought to be well settled.[9] Indeed, any transportation scheme that relies upon a limited-capacity vehicle (car, boat, pipeline, etc.) will require a physical location to accommodate excess inventory—property reserved for future demand and not designated for transportation at all. Could a seller of surplus inventory claim that its indefinite warehouse storage is transitory because the alternative would be the dangerous prospect of stalling a fleet of overloaded trucks on the highway? Of course not. That result would render

---

[9] For instance, if facilitating transportation in general was sufficient to deem a stoppage transitory, would not the always-present cushion gas (something both parties agree is taxable) be immune because it provides the requisite pressure to create transit? And if ETC stored its gas for not months, not years, but decades, would that gas not also be immune from taxes by "facilitating transportation" all the while? These are but a few of the potential consequences of adopting ETC's theory.

22

storage of surplus property categorically immune from state taxation. And this Court and the Supreme Court have repeatedly found taxation of stored surplus permissible. *See, e.g., McLean,* 291 U.S. at 21–22; *Calvert*, 502 S.W.2d at 693.

So let us once again focus on the journey of ETC's taxed gas. Put in practical terms, ETC's claimed purpose for its extended storage is due to a mechanical constraint on the transportation system—HPL's limited pipeline capacity. But that constraint does not require the gas to remain sedentary for months at a time. Even if the pipeline's diameter was miles wide and could accommodate all of the reservoir's gas at once, ETC would continue to store its gas until the profitable winter season. ETC's need for extended storage is thus divorced from HPL's mechanical limitations: it is due to ETC's practice of injecting gas that lacks a known destination and that exceeds consumer demand. To be sure, there is nothing untoward about that purpose—it is no doubt expected in the natural-gas industry to conduct business as ETC does. But from the Commerce Clause's perspective, the circumstances of a stoppage matter. Succinctly, ETC does not store gas to facilitate a continuous journey; ETC stores gas to avoid transportation for the time being—the antithesis of continuity.

Finally, ETC points to FERC regulations to make its case that its gas storage is inextricably intertwined with transportation. In particular, ETC relies on a definitional provision: "Transportation includes storage." 18 C.F.R. § 284.1. Because FERC groups the terms together, ETC argues, storage is inherent to transportation such that ETC's stored gas is still in transit. Ultimately, the regulation's context casts doubt on that inference.

In examining the meaning and the purpose of Section 284.1, "a page of history is worth a volume of logic." *N.Y. Tr. Co. v. Eisner*, 256 U.S. 345, 349 (1921). That history is told best by

23

*United Distrib. Cos. v. Fed. Energy Regulatory Comm'n.  See* 88 F.3d 1105, 1122–23 (D.C. Cir. 1996).  There the court explained that the "overriding purpose" of the Natural Gas Act (the statute giving FERC jurisdiction over natural-gas transportation) was to "curb pipelines' potential monopoly power over gas transportation."  *Id.* at 1122.  To that end, FERC issued Order No. 436, which deemed natural-gas pipelines "common carriers."  *Id.* at 1123–24.  However, Order No. 436 granted pipelines a certification to transport gas only upon a pipeline's "acceptance of non-discrimination requirements guaranteeing equal access for all customers."  *Id.* at 1123.  And in order to extend this equal access to storage facilities as well, FERC amended the definition of transportation to include storage—giving us the provision as we know it today.  *Id.* at 1133; 18 C.F.R. § 284.1.

This history is instructive.  It is plain that FERC's choice to expand the definition of transportation is not a proclamation on the transitory nature of all gas placed in storage.  Nor does FERC's definition provide insight into the propriety of state taxation in the case at hand.  FERC simply chose to broaden the scope of its anti-discrimination regulations.  And the fact that property is subject to the regulatory power of Congress (or here, an administrative agency) is immaterial to the separate question of whether the state can levy a constitutional, nondiscriminatory tax.  *See Blasisus*, 290 U.S. at 8 (emphasizing that because commerce might be "subject to the regulating power of the Congress," does not mean the state cannot lay a nondiscriminatory tax).  In sum, the FERC regulations do not play a role in our analysis.[10]

---

[10] In fact, the procedural history of *Missouri Gas* indicates that FERC itself seems to agree with this conclusion. There the Oklahoma Supreme Court likewise concluded that FERC regulations were immaterial to the substantial-nexus question. *Mo. Gas*, 234 P.3d at 955–56.  After the adverse decision, the gas transporter petitioned the Supreme Court of the United States for a writ of certiorari.  The then-Solicitor General of the United States, joined by a FERC attorney, filed an amicus brief recommending that the Court deny the petition. *See* Brief for the United States as Amicus Curiae at *1, *Mo. Gas v. Schmidt*, No. 09-1458, 2010 WL 304443.  And importantly, the United States' brief agreed with the finding that FERC regulations did not dictate the result of the Commerce Clause challenge. *Id.* at *16.

Having exhausted ETC's arguments to the contrary, we conclude that ETC's storage here broke continuity of transit. Therefore, we find the gas bore a substantial nexus to the state such that the first prong of *Complete Auto* is satisfied. To the extent the court of appeals in *Peoples* found otherwise for similarly situated gas, we disapprove of that analysis. We now take the remaining *Complete Auto* prongs in turn.

### 2. Fair Apportionment

To survive Commerce Clause scrutiny, a tax must also be fairly apportioned to activities occurring within the state. The purpose of this prong is to "ensure that each State taxes only its fair share of an interstate transaction." *Goldberg v. Sweet*, 488 U.S. 252, 261 (1989). The prong is satisfied if the tax is "internally and externally consistent." *Id.* ETC does not suggest the tax is externally inconsistent but relies instead on the tax's alleged internal inconsistency. A tax is internally inconsistent—and thus violative of the Commerce Clause—when it is structured such that "if every state were to impose an identical tax," multiple taxation would occur. *Id.*

ETC warns that if Texas's tax were to stand, it would subject ETC to the risk of multiple taxation across other jurisdictions. In doing so, ETC confuses both the specific nature of the inquiry and the scope of Texas's ad valorem tax. First, the test does not ask whether an array of varying tax schemes could double tax property traveling across state lines; it asks whether an identical tax, imposed elsewhere, would impose a greater tax burden on traveling property than on property that remains within the state. *See id.* This distinction is vital considering the boundaries of the ad valorem tax. In relevant part, Texas's tax reaches only property that is (1) located within a taxing

25

unit of the state and (2) present on a certain day of the year: the first of January.[11] TEX. TAX. CODE § 21.02(a)(1). We must conduct our analysis under the assumption that other states would impose an identical tax—likewise only reaching property located in their jurisdictions on the first of January.[12]

The import of Texas's widely-adopted taxing scheme, from a Commerce Clause perspective, is that the tax recognizes a simple truth: property can only be in one place at one time. By placing both a geographic and a temporal limit on the state's taxing power, the ad valorem tax and its hypothetical counterparts effectively negate the possibility of multiple taxation across jurisdictions—the scheme ensures that each piece of property is taxed only once per year.[13] Unsurprisingly, the Oklahoma Supreme Court recognized that cases dealing with the internal-consistency question typically "involve taxed *activities* that have multi-state facets, rather than taxed *property*." *Mo. Gas Energy*, 234 P.3d at 958 (emphasis in original). For good reason—a nondiscriminatory property tax confined by both geography and timing is inherently internally consistent. Consequently, the tax satisfies the second prong of *Complete Auto*.

---

[11] As explained earlier, most owners of inventory are free to elect a September 1 appraisal as an alternative. TEX. TAX CODE § 23.12(f).

[12] In reality, every state that borders Texas appraises property as of January 1, meaning the "hypothetical identical tax" is not so hypothetical after all. *See* N.M. STAT. ANN. § 7-38-7 ("All property subject to valuation for property taxation purposes shall be valued as of January 1 of each tax year . . . ."); 68 OKLA. STAT. ANN. § 2831(a) (assessing ad valorem taxes as of "the first day of January of each year"); ARK. CODE ANN. § 26-26-1201 ("All property in this state shall be assessed by the authorized authorities according to its value on January 1."); LA. STAT. ANN. 47:1952 § 1952 (assessing taxes on the "first day of January").

[13] For example, envision 20 cubic feet of gas. Assume further that all the gas resides initially in Texas and is taxed on January 1 of year one. Then, 10 cubic feet of gas travels to Oklahoma. In year two—pursuant to the hypothetically identical Oklahoma tax—the Oklahoma gas is taxed on January 1. Yet the 10 cubic feet of gas remaining in Texas is also taxed on January 1 of year two, i.e., an identical tax burden on all of the gas despite the existence of interstate travel.

### 3. Discrimination Against Interstate Commerce

Under the third prong of *Complete Auto*, we ask whether the ad valorem tax discriminates against interstate commerce. Specifically, we examine whether the tax provides "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Env'tl Quality of Or.*, 511 U.S. 93, 99 (1994).

ETC and aligned *amici* argue the tax here creates a "financial barrier" around Harris County, discriminating against interstate transporters by forcing those transporters to avoid the jurisdiction and the accompanying tax. That argument is incorrect for several reasons. First, all taxes burden commerce—that much is inescapable. Yet a tax is discriminatory only when it burdens commerce because of the commerce's interstate character. *See id.* Of course, no differential treatment is at play here. The ad valorem tax targets all qualifying personal property; it pays no attention to the property's intended destination. We recognized as much in *Diamond Shamrock*, relegating the discussion to a footnote and explaining "[t]here is no possible question that this nondiscriminatory ad valorem tax fails the third prong of the test." 876 S.W.2d at 301 n.4 (addressing a challenge to the same ad valorem tax applied to different property). Although perhaps unsurprising given the evenhanded nature of the tax, it is nevertheless telling that ETC does not direct us to a single case finding an ad valorem tax discriminatory. The tax is facially nondiscriminatory. The tax is likewise nondiscriminatory as applied to ETC's gas. HCAD assessed taxes on ETC's entire amount of stored gas, regardless of the fact that ETC planned to sell some out of state and some in state. If unconstitutional, differential treatment were at play, HCAD would have treated gas intended for out-of-state use differently than gas intended for use in Texas. HCAD did no such thing. *See, e.g., Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 618 (1981) (declaring a state tax on coal

27

nondiscriminatory because the "tax is computed at the same rate regardless of the final destination of the coal, and there is no suggestion here that the tax is administered in a manner that departs from this even-handed formula").

Second, and more fundamentally, ETC's financial-barrier argument implicitly equates every tax with a discriminatory burden. That the imposition of a tax will cause ETC and others to avoid Harris County is not evidence of discrimination but rather the consequence of a business reality; businesses will travel to jurisdictions where the cost of doing business is the cheapest. In fact, purely intrastate transporters of gas would be equally inclined to avoid Texas and head for greener (more tax friendly) pastures. The Supreme Court recognized this simple truth in saying, "[i]t was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business." *W. Live Stock v. Bureau of Revenue*, 303 U.S. 250, 254 (1938). Thus, a state can constitutionally require interstate property to "pay its way." *Id.* If the state wants to incentivize gas marketers to remain in Texas, it is free to modify its tax policy.

### 4. Reasonable Relationship to Services

To conclude our Commerce Clause analysis, *Complete Auto* requires us to determine whether the tax at issue is reasonably related to the services provided by the state. This fourth prong "requires no detailed accounting of the services provided to the taxpayer on account of the activity being taxed." *Jefferson Lines*, 514 U.S. at 199. Indeed, "[i]nterstate commerce may thus be made to pay its fair share of state expenses and contribute to the cost of providing *all* governmental services from which it arguably receives no direct benefit." *Id.* at 199–200 (citing *Goldberg*, 488 U.S. at 267) (internal quotations omitted and emphasis in original). Specifically, "police and fire

28

protection, along with the usual and usually forgotten advantages conferred by the State's maintenance of a civilized society, are justifications enough for imposition of a tax." *Jefferson Lines*, 514 U.S. at 200 (citing *Goldberg*, 488 U.S. at 267).

ETC does not argue that the degree of the tax is disproportionate to the amount of services provided but rather that the stored gas is not the beneficiary of any services worthy of a state tax. ETC advances this position by again distinguishing its stored gas from HPL's pipeline facility.[14] HPL owns the Bammel facility and pays taxes on the facility and cushion gas that is permanently located at the facility. HPL's taxes, ETC says, cover all services provided to the facility, and ETC's gas benefits from no additional services. The *Peoples* court of appeals employed the preceding reasoning, as did the dissenting justice below. *See Peoples*, 270 S.W.3d at 219 (explaining that "services such as law enforcement and the fire department would serve the [pipeline's] facility itself," not the taxed gas); 476 S.W.3d at 523 (Keyes, J., dissenting) (concluding that the services benefitted HPL's facility itself, not the stored gas).

Though ETC cites *Peoples* as support for the distinction between the facility and stored gas, the chain of authority goes no further.[15] A pipeline may pay substantial taxes for the property it owns, but the pipeline pays zero taxes on a marketer's stored gas—property the pipeline does not own. Yet the state provides services to the stored gas all the same. When the fire department arrives

---

[14] ETC's additional citation to *American River Transportation Co. v. Bower*, 813 N.E.2d 1090 (Ill. App. Ct. 2004), is without merit. There, an intermediate Illinois court held that a tax on tugboats operating on interstate rivers was not fairly related to state services. *Id*. at 1091–93. This conclusion followed from the simple fact that the United States—not Illinois—was the sole regulator and protector of the waters. *Id*. at 1093. The court also explained that Illinois' general maintenance of clean water was too attenuated to be considered a benefit to the tugboats. *See id*. These findings bear no relevance to ETC's storage of natural gas.

[15] The court's reasoning in *Peoples* may have followed from its earlier reliance on the taxpayer's physical presence. *See* 270 S.W.3d at 219. Just as we rejected that logic in discussing the substantial-nexus prong, we do so here as well. In a case involving ad valorem taxation, it is the property that must bear a substantial nexus, and it is the property that must receive services—not the taxpayer.

to quench an inferno at the pipeline's facility, the fire chief does not instruct her crew to extinguish only the flames that threaten the pipeline's property. Instead, the fire department protects the entirety of the personal property, structures and stored gas alike. ETC cannot cling to other taxed property to avoid paying its fair share for services.

Furthermore, the approach advanced by ETC threatens to provide—quite literally—tax shelters to dealers in interstate goods. Indeed, those dealers could avoid state taxation altogether by storing their goods in a warehouse, so long as the warehouse is owned by someone else. At bottom, ETC willfully contracted for and benefits from the activity of gas storage. So long as ETC enjoys the "opportunities and protections which the state has afforded in connection with" storage (it most certainly does), the mere fact of an entrustment relationship should not relieve ETC of a nondiscriminatory tax burden. *Commonwealth Edison*, 453 U.S. at 626 (explaining that a proportionate tax is justified so long as a taxpayer enjoys state services in connection with the taxed activity). The fourth prong of *Complete Auto* is satisfied.

### IV. Conclusion

Having met all the prongs of *Complete Auto*, the tax levied in this case withstands constitutional scrutiny. And because the tax does not violate the Commerce Clause, neither does it violate Section 11.12 of the Texas Tax Code, which provides a state-law exemption for taxes that would otherwise violate federal law. TEX. TAX CODE § 11.12.

To be clear, our holding does not constitute blanket approval of any taxation of stored natural gas. As is the case with all property, there may be circumstances in which taxation of gas runs afoul of the Commerce Clause. This scenario—nondiscriminatory taxation of surplus gas held without a destination for future resale—is just not one of them.

30

The judgment of the court of appeals is affirmed.

_____
John P. Devine
Justice

Opinion Delivered: April 28, 2017