

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00252-CV

_____

JIM BURGESS, Appellant

V.

CITY OF WESTWORTH VILLAGE, Appellee

---

On Appeal from County Court at Law No. 2
Tarrant County, Texas
Trial Court No. 2022-000739-2

---

Before Kerr, Wallach, and Walker, JJ.
Opinion by Justice Wallach

# OPINION

On occasion, to serve a public purpose, a citizen's private property must be taken without his consent. We tolerate such intrusions because society cannot function without roads, schools, military facilities, and other vital infrastructure. Eminent domain also requires "just" or "adequate" compensation, to be sure. U.S. Const. amend. V; Tex. Const. art. I, § 17(a). But the condemnation process is complicated, time-consuming, and sometimes confusing. And no compensation can accurately value the sweat, tears, pride, love, beauty, and history that, for some property at least, is its chief value. A given exercise of eminent domain may turn out to be all for nothing, too. Grand plans can fail. Property may therefore be permanently damaged without purpose.

These circumstances help explain why our law directs Texas courts to carefully scrutinize any exercise of eminent-domain authority. **Condemnation is one area in which the government must turn sharp corners. It is a fit role for the judiciary to ensure that the government stays in its lane.**

*Miles v. Tex. Cent. R.R. & Infrastructure, Inc.*, 647 S.W.3d 613, 632 (Tex. 2022) (Young, J., concurring) (footnotes omitted) (emphasis added).

This is an eminent-domain case presenting an issue of first impression regarding the interplay between recent amendments to the Texas Constitution and Texas Government Code on one side, and the legislative deference rule on the other—indeed, a sharp corner in the eminent-domain process.

Jim Burgess (owner) owns a home on land (the land) situated on the south side of the Hawks Creek Golf Course (golf course) that is owned and operated by the City of Westworth Village (City). Related to the condemnation of the land, City executed a ninety-nine-year lease of portions of the golf course facilities and the land—even without owning the land—with UnderPar Life, LLC (UPL), a private golf course

2

entertainment company, to operate and upgrade portions of the golf course facilities. Specifically, the land was to be developed by UPL as a "short-game practice area." After UPL and City were unable to negotiate a purchase of the land from owner, City initiated condemnation proceedings (City's last, rejected offer was $1,100,000). After a special commissioners' proceeding concluded, owner rejected the special commissioners' award of $1,545,500, and City proceeded with its suit to condemn the land.

City moved for partial summary judgment to establish the liability elements of its eminent-domain claim, which was granted. In his First Amended Plea to the Jurisdiction and Motion to Set Aside Order Granting Partial Summary Judgment, owner disputed the court's subject matter jurisdiction by challenging the validity of City's eminent-domain claim under Texas Constitution Article I, Section 17 and Texas Government Code Section 2206.001(b)(1)–(4). The trial court overruled the First Amended Plea to the Jurisdiction and Motion to Set Aside Order Granting Partial Summary Judgment, leaving only the value of the land to be tried to a jury. After the jury determined the value of the land as $1,313,675, which was more than City had offered before initiating condemnation proceedings but less than the special commissioners' award, the court entered judgment for City condemning the land for the amount found by the jury and granted owner's request for court costs. Owner appealed. City cross-appealed challenging the award of costs to owner. We will reverse and remand.

3

## I.      Background

It is uncontroverted that owner owns the land, a 3.548-acre tract. On September 7, 2021, City's mayor issued a press release describing the overall transaction involved in this lawsuit. In this press release, City announced that it had been negotiating with UPL "behind-the-scenes" for eighteen months and would be unveiling the new plans for the golf course at a public hearing on September 14, 2021. Pertinent points in the release are:

> **\*** City will lease the non-golf-course area—driving range, clubhouse, parking area, practice areas—to UPL on a ninety-nine-year lease, and City will continue to own and operate the golf course.
>
> **\*** "Highlights" of the lease are: (1) *UPL will acquire owner's land, which will be deeded to the city and leased back to UPL as a short-game practice area*; (2) *at no cost to the city, the existing ninety-nine year old, poorly maintained clubhouse will be razed and UPL will build a new one, to include "an area for our golf shop operations*, a 5,000-square-foot, chef-operated fine dining facility open to the public, *and [UPL]'s practice facility and offices*;" (3) a world-class, state-of-the-art golf practice facility, open to the public; (4) immediate annual rental of $60,000 expected to increase dramatically over time*, which will add significantly to the city's sales tax base*; (5) "[*a*] *carried, non-dilutable equity interest in [UPL], which intends to use this magnificent facility as the model for* other similar projects around the country." [Emphases added.]

The city council met on September 14, 2021. The meeting agenda reflects that after the mayor and the president of Westworth Redevelopment Authority (WRA) would make public presentations regarding the golf course proposal, then the council would go into executive session. The executive session, pursuant to Texas Government

4

Code Section 551.087,[1] was to include deliberations about "economic development negotiations" regarding the golf course transaction. Following the executive session, the public session would resume, and the mayor and WRA's president were to discuss and take action on the lease. And, on September 14, 2021, the parties signed the lease.[2]

On October 12, 2021, the city council passed Resolution 2022-01 that declared (1) City "desires to expand and operate" the publicly accessible golf course "to serve *existing and future development* in the City," (2) acquiring the land was necessary for such, and (3) this acquisition constituted "a public use for a public purpose." [Emphasis added.] It further declared that the land was "needed so that [City] can complete the Project [golf course expansion], which is a public purpose and is necessary to serve the public health, safety[,] and welfare." The resolution was silent about the UPL lease and City's intent to acquire the land and transfer it to UPL.

---

[1]Section 551.087 excludes from open meeting requirements: (1) discussions or deliberations "regarding commercial or financial information that the governmental body has received from a business prospect that the governmental body seeks to have locate, stay, or expand in or near the territory of the governmental body and *with which the governmental body is conducting economic development negotiations*"; or (2) deliberations concerning "the offer of a financial or other incentive to a business prospect described by Subdivision (1)." Tex. Gov't Code Ann. § 551.087 (emphasis added).

[2]The lease granted UPL an option to purchase the entire golf premises if, after the fifteenth year of the rent commencement date, City gave notice of its intent to sell the entire golf premises to a third party for non-golf uses. It also provided that the "purpose" of the lease was "solely for business or commercial purposes, and not for personal, family, or household purposes."

On October 23, 2023, D Magazine published an article in which the co-founder of UPL is quoted in several pertinent passages regarding the lease:

*"[UPL] will be, hands down, the premier public-use golf practice facility in the [S]tate of Texas."

*UPL's strategy is "partnering with municipally owned golf courses" since it "removes significant financial obstacles and allows us to grow the community of golfers."

*UPL will "be able to access debt because of the long-term nature of our lease agreements."

Finally, in the lease, the agreed "use" of the premises—including the land—was for "[t]he Golf Performance Center at Hawk's Creek[]" to consist of "a golf course driving range, practice areas, clubhouse, parking, and [an] ancillary office."

## II. Standards of Review

We must first decide the proper standards of review. Ordinarily, the standards of review for a case are well established. However, due to relatively recent statutory and constitutional amendments regarding eminent domain, a detailed analysis is necessary in this instance.

### a. Does the principle of judicial deference to legislative declarations of "public use" apply to this case?

Texas Constitution Article I, Section 17 provides that "[n]o person's property shall be taken, damaged, or destroyed for or applied to *public use* without adequate compensation being made . . . ." Tex. Const. art. I, § 17(a) (emphasis added). "This provision of the Texas Bill of Rights reflects that the right to own, use, and enjoy one's

private property is a fundamental right and [is] among our most cherished liberties." *Commons of Lake Houston, Ltd. v. City of Houston*, 711 S.W.3d 666, 675 (Tex. 2025) (cleaned up). But this clause does not preclude governmental entities from taking, damaging, destroying, or applying private property; rather, it requires that any such action be done for a public use and that the government adequately compensate the owner for the property taken. *Id.* (citing *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019)).

Historically, when a city sought to exercise its right of eminent domain, it had the burden of demonstrating that (1) it intended to put the property to public use, and (2) the condemnation was necessary to advance or achieve that public use. *City of Austin v. Whittington*, 384 S.W.3d 766, 772 (Tex. 2012); *see* Tex. Const. art. I, § 17; Tex. Loc. Gov't Code Ann. § 251.001(a). The ultimate question of whether a particular use was a "public use" was a judicial question to be decided by the courts. *KMS Retail Rowlett, LP*, 593 S.W.3d at 187; *City of Austin*, 384 S.W.3d at 777–78. But, a legislative declaration of public use by the condemnor was entitled to judicial deference. *KMS Retail Rowlett, LP*, 593 S.W.3d at 187; *City of Austin*, 384 S.W.3d at 777–78. Under this historical approach, "In the absence of allegations that the condemnor's determinations of public use and necessity were fraudulent, in bad faith, or arbitrary and capricious, the legislative declaration that a specific taking is necessary for a public use is conclusive." *City of Austin*, 384 S.W.3d at 777 (citing *Coastal Indus. Water Auth. v. Celanese Corp. of Am.*, 592 S.W.2d 597, 600 (Tex.1979)).

This historical approach developed as "judge invented interpretive rules." *KMS Retail Rowlett, LP*, 593 S.W.3d at 193. It arose under the application of the 1876 Texas Constitution, which provided,

> No person's property shall be taken, damaged, or destroyed for or applied to *public use* without adequate compensation being made, unless by the consent of such person; and, when taken, *except for the use of the State*, such compensation shall be first made, or secured by deposit of money; and no irrevocable or uncontrollable grant of special privileges or immunities[] shall be made; but all privileges and franchises granted by the Legislature[] or created by its authority shall be subject to the control thereof.

Tex. Const. art. I, § 17 (1876) (amended 2009) (emphases added); *see KMS Retail Rowlett, LP*, 593 S.W.3d at 194–95 (Blacklock, J., dissenting).

Traditionally, Texas and federal constitutional law on governmental takings for public use was applied in a consistent and complementary fashion. *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 477 (Tex. 2012). However, in 2005, the course of eminent-domain law experienced a significant change. The precipitating factor for the change was the United States Supreme Court's opinion in *Kelo v. City of New London*, 545 U.S. 469, 487–90, 125 S. Ct. 2655, 2668 (2005), holding that a city's condemnation of private property for transfer to other private entities for economic re-development of distressed areas did not violate the federal Constitution's Fifth Amendment's Takings Clause. As observed by our Supreme Court,

> In a special-called session later that year, the Texas legislature enacted Government Code chapter 2206, which placed new statutory limits on governmental entities' eminent-domain authority. Act of Aug. 16, 2005, 79th Leg., 2d C.S., ch. 1, § 1, 2005 Tex. Gen. Laws 1, 1–2. Specifically, chapter 2206 prohibits a taking *that (1) "confers a private benefit on a particular*

8

*private party through the use of the property"*, (2) *"is for a public use that is merely a pretext to confer a private benefit on a particular private party"*, (3) *is for "economic development purposes"*, *or (4) "is not for a public use."* Tex. Gov't Code Ann. § 2206.001(b)(1)–(4). These *limitations* were considered a swift legislative response to *Kelo. See W. Seafood Co. v. United States*, 202 F. App'x 670, 677 (5th Cir. 2006) (noting that chapter 2206 was passed in response to the *Kelo* decision); *see also Harris C[n]ty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 813 (Tex. 2016) (Lehrmann, J., concurring) (noting that chapter 2206 "has widely been viewed as a response to *Kelo*").

*KMS Retail Rowlett, LP*, 593 S.W.3d at 181–82. (emphases added). The legislature did not define "public use" in this legislation. Because the legislature is presumed to enact legislation with complete knowledge of the existing law and with reference to it, *Bush v. Lone Oak Club, LLC*, 601 S.W.3d 639, 647 (Tex. 2020), the legislature is presumed to have known of the "legislative deference" rule and that "public use" had been construed to mean that

> [p]roperty is taken for public use only when "there results to the public some definite right or use in the business or undertaking to which the property is devoted." *See Coastal States Gas Producing Co. v. Pate*, 158 Tex. 171, 309 S.W.2d 828, 833 (1958). "It is immaterial if the use is limited to the citizens of a local neighborhood, or that the number of citizens likely to avail themselves of it is inconsiderable, so long as it is open to all who choose to avail themselves of it." *See Hous. Auth. of City of Dallas v. Higginbotham*, 135 Tex. 158, 143 S.W.2d 79, 83, 84 (1940). *Similarly, the mere fact that a particular individual, group, or enterprise may benefit will not deprive the use of its public character. See id.* This Court has, however, invalidated takings that conferred only a private benefit on a private party. *See Maher v. Lasater*, 163 Tex. 356, 354 S.W.2d 923 (1962); *Phillips v. Naumann*, 154 Tex. 153, 275 S.W.2d 464 (1955)[,]

*KMS Retail Rowlett, LP*, 593 S.W.3d at 186–87 (emphases added).

In this same legislation, the legislature also added Government Code Section 2206.001(e), providing,

9

The determination by the governmental or private entity proposing to take the property that the taking does not involve an act or circumstance *prohibited by Subsection (b) does not create a presumption with respect to whether the taking involves that act or circumstance.*

Tex. Gov't Code Ann. § 2206.001(e) (emphasis added).

Finally, in 2009, the people of Texas voted to rewrite Texas Constitution Article I, Section 17 to read, in pertinent parts, that

(a) No person's property shall be taken, damaged, or destroyed for or applied to *public use* without adequate compensation being made, unless by the consent of such person, and only if the taking, damage, or destruction is for:

(1) the ownership, use, and enjoyment of the property, notwithstanding an incidental use, by:

(A) the State, a political subdivision of the State, or the public at large; or

(B) an entity granted the power of eminent domain under law; or

(2) the elimination of urban blight on a particular parcel of property.

(b) *In this section, "public use" does not include the taking of property under Subsection (a) of this section for transfer to a private entity for the primary purpose of economic development or enhancement of tax revenues.*

Tex. Const. art. 1, § 17 (emphases added).

The Texas Supreme Court has not directly addressed the interplay between these recent statutory and constitutional amendments and the procedure for establishing an eminent-domain taking for "public use." *See Miles*, 647 S.W.3d at 636–37 (Devine, J.,

10

dissenting); *KMS Retail Rowlett, LP*, 593 S.W.3d at 193–94. Thus, we are at liberty to interpret the amendments' effects and to apply our interpretation accordingly.[3]

We construe the Texas Constitution and statutes de novo. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010); *City of Fort Worth*, 649 S.W.3d at 249. In construing statutes and the constitution, the primary objective is to give effect to the framers' intent. *Tex. Lottery Comm'n*, 325 S.W.3d at 635; *City of El Paso v. El Paso Cmty. Coll. Dist.*, 729 S.W.2d 296, 298 (Tex. 1986). The court noted in *Texas Lottery Commission*,

> We rely on the plain meaning of the text as expressing legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context, or the plain meaning leads to absurd results. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008). We presume the [l]egislature selected language in a statute with care and that every word or phrase was used with a purpose in mind. *See In re Caballero*, 272 S.W.3d 595, 599 (Tex. 2008); *Chastain v. Koonce*, 700 S.W.2d 579, 582 (Tex. 1985).

325 S.W.3d at 635; *see also Bosque Disposal Sys., LLC v. Parker Cnty. Appraisal Dist.*, 555 S.W.3d 92, 94 (Tex. 2018) (stating that when interpreting the state constitution, courts rely heavily on its literal text, giving effect to its plain language).

---

[3]The courts of appeals may address questions of statutory and constitutional application where amendments to those documents have not been addressed by the Supreme Court. *Vaccaro v. Raymond James & Assocs., Inc.*, 655 S.W.3d 485, 489 n.3 (Tex. App.—Fort Worth 2022, no pet.); *City of Fort Worth v. Rylie*, 649 S.W.3d 246, 248 (Tex. App.—Fort Worth 2022, pet. denied); *Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 565 (Tex. App.—Austin 2004, no pet.).

Although owner challenged the validity of City's claim under Texas Constitution Article I, Section 17(a) and (b), and Texas Government Code Section 2206.001(b)(1–4) and (e), our analysis is focused on the constitutional provision and Government Code Subsections (b)(4) and (e). Based on our analysis, for the purpose of establishing the proper standard of review of this case—whether the government stayed in its lane— we hold that no legislative deference, or presumption, applies to City's declaration of "public use" because owner's challenge is based on Article I, Section 17(a) and (b) of the Texas Constitution and Government Code Section 2206.001(b)(4) and (e).[4]

First, the central issue in this case is whether the City's condemnation of owner's land is subject to Texas Government Code Section 2206.001(b)(4) and (e), which strips legislative declarations of "public use" of deferential effects when the owner's challenge is based on there being no "public use" for the condemnation. City contends that the condemnation was necessary to acquire the land for "public use" as part of the golf course redevelopment. *See* Tex. Loc. Gov't Code Ann. § 251.001(a)(1) (providing that a local governmental entity may exercise its power of eminent domain to take property for a recreational facility or park). Specifically, City contends that this condemnation is for a "park," so it falls under Texas Government Code Section 2206.001(c)(4), for

---

[4]There is no dispute about the application of the legislative deference rule as it applies to the question of necessity for a public use, as opposed to the existence of public use, under the Local Government Code. *KMS Retail Rowlett, LP*, 593 S.W.3d at 200 (Blacklock, J., dissenting).

which the deferential effect of a legislative declaration of "public use" remains effective. *See KMS Retail Rowlett, LP*, 593 S.W.3d at 184; *Milberger Landscaping, Inc. v. San Antonio Water System ex rel. City of San Antonio*, No. 08-23-00283-CV, 2024 WL 5099206, at *10 (Tex. App.—El Paso Dec. 12, 2024, pet. denied) (mem. op.). We agree that the condemnation of the land itself falls within the general scope of use for a "park." *See City of Plano v. Homoky*, 294 S.W.3d 809, 814 (Tex. App.—Dallas 2009, no pet.); *see also State v. Merrill*, 334 S.W.2d 432, 434 (1960) ("It is a matter of common knowledge that 'parks' are used by the public generally for recreation through many different games, such as . . . golf" (quoting *Golf View Realty Co. v. Sioux City*, 269 N.W. 451, 456 (Iowa 1936))).

However, City's analysis falls short. While such an application would be consistent with the Supreme Court's interpretation in *KMS Retail Rowlett, LP* that Section 2206.001(c) is a "clear-cut exception to the limitations imposed by [S]ubsection (b)," the Court also observed that "if a taking is for a transportation project [here a park], *the condemnor is* constrained" by "*the limitations imposed by the constitution.*" 593 S.W.3d at 184 (emphases added). It is the constitutional limitation on transferring condemned property for an impermissible purpose that distinguishes this case.

Government Code Section 2206.001 enacted in 2005 and the 2009 amendments to Texas Constitution Article I, Section 17 were enacted as limitations on the power of eminent domain. *Id.*; *Crawford Fam. Farm P'ship v. TransCanada Keystone Pipeline, L.P.*, 409 S.W.3d 908, 910 (Tex. App.—Texarkana 2013, pet. denied) (stating that

13

2009 constitutional amendment was titled on the ballot as "Limits on power of eminent domain"). Section 2206.001 is titled "Limitation on Eminent Domain for Private Parties or Economic Development Purposes." Tex. Gov't Code Ann. § 2206.001.

The legislature may not authorize what the constitution prohibits. *Maher*, 354 S.W.2d at 925. Amended Texas Constitution Article I, Section 17(a) limits eminent domain taking to "public use," and Subsection (b) excludes from "public use" "the taking of property under subsection (a) of this section for *transfer to a private entity*" for the "*primary purpose* of *economic development* or *enhancement of tax revenues*." Texas Const. art. I, § 17 (emphases added). Thus, motivated by the *Kelo* opinion, the people of Texas voted to limit the scope of takings for "public use" by excluding situations where property is being condemned for transfer to a private entity where the *transfer* of the condemned property is *to a private entity* for the "*primary purpose* of *economic development* or *enhancement of tax revenues*." *Id.* § 17(b) (emphases added).[5] As a result, to conclude that a constitutional taking is for "public use" when the property being taken is to be transferred to another private entity, the legislative body must declare that the *transfer*

_____

[5]"Transfer" is not defined here. The plain and common meaning of "transfer" is "to make over or negotiate the possession or control of (a right, title, or property) by a legal process usually for a consideration: convey." *Fitness Int'l, LLC v. Hegar*, No. 03-15-00534-CV, 2016 WL 3391606, at *3 (Tex. App.—Austin June 16, 2016, pet. denied) (mem. op.) (citing Webster's Third New Int'l Dictionary 2426–27 (2002)); *Cheddar's Casual Café, Inc. v. Hegar*, 644 S.W.3d 771, 776 (Tex. App.—Austin 2022, no pet.). Under this definition, we hold that a ninety-nine-year lease of real property is a "transfer" under Section 17(b).

of the condemned property does not run afoul of the restrictions in Subsection 17(b). If it does run afoul then there is no "public use."

Second, we must evaluate how Government Code Section 2206.001 interfaces with this new constitutional limitation on the definition of "public use." Tex. Gov't Code Ann. § 2206.001. Subsection (b) "plainly limits" eminent-domain authority. *KMS Retail Rowlett, LP*, 593 S.W.3d at 184. Importantly, Section 2206.001(e) provides,

> The *determination* by *the governmental* or private *entity* proposing to take the property *that the taking does not involve an act or circumstance prohibited by Subsection (b) does not create a presumption* with respect to whether the taking involves that act or circumstance.

Tex. Gov't Code Ann. § 2206.001(e) (emphases added). Statutes are given a construction consistent with constitutional requirements, when possible, because the legislature is presumed to have intended compliance with the constitution. *Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 715 (Tex. 1990); *Chapa v. Spivey*, 999 S.W.2d 833, 835 (Tex. App.—Tyler 1999, no pet.). Therefore, we will apply the "public use" language from Article I, Section 17 in our analysis of Government Code section 2206.001(b)(4) and (e).

As noted above, the legislature was presumed to have known of the legislative deference rule that applied to legislative declarations of "public use" when it passed Section 2206.001. That rule applied generally in judicial proceedings where legislative declarations of "public use" had been issued by the condemning authority. *KMS Retail Rowlett, LP*, 593 S.W.3d at 182. In enacting Section 2206.001(e), the legislature clearly

15

intended to change the law related to legislative deference by drawing a distinction between categories of condemnations where the legislative deference rule would apply (*see* Section 2206.001(c)) and those where it would not apply (*see* Section 2206.001(b), (e)). Tex. Gov't Code Ann. § 2206.001(b), (c), (e); *see KMS Retail Rowlett, LP*, 593 S.W.3d at 184; *Milberger Landscaping, Inc.*, 2024 WL 5099206, at *10.

Because owner's challenge in this case includes section 2206.001(b)(4)—no public use—the legislative presumption is not applicable by virtue of Section 2206.001(e). *See* Tex. Gov't Code Ann. § 2206.001(b)(4), (e); *see also KMS Retail Rowlett, LP*, 593 S.W.3d at 184. This conclusion necessarily derives from the structure of Section 2206.001. To be consistent with the 2009 amendments to Texas Constitution Article I, Section 17(b), a legislative declaration of "public use" would necessarily involve an express or implied declaration that a transfer of the condemned property to a private entity is not for the "primary purpose of economic development or enhancement of tax revenues." *See* Tex. Const. art I, § 17. But, under Section 2206.001(e), such a declaration has no deferential effect. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 681 (Tex. 1979) (holding that where the legislature intended a change in existing law by amendment, the courts will endeavor to effect the change).[6] This interpretation

---

[6]*See also Suretec Ins. Co. v. Myrex Indus.*, 232 S.W.3d 811, 815–16 (Tex. App.—Beaumont 2007, pet. denied) (stating that the legislature is presumed to have intended to make changes to existing law by an amendment and the courts will endeavor to give effect to the amendment); *Coates v. Parnassus Systems, Inc.*, No. 03-01-00549-CV, 2002 WL 534595, at *4 (Tex. App.—Austin Apr. 11, 2002, no pet.) (not designated for publication). "A constitutional amendment reflects the will of the people to change the

16

would be consistent with the legislature's intent to provide greater statutory limitations on matters that were the subject of the *Kelo* decision. *See KMS Retail Rowlett, LP*, 593 S.W.3d at 184.

Further, City cannot prevail on its argument that this is a condemnation of a park for "public use" under the Local Government Code. Because Article I, Section 17(b) constitutionally limits "public use" by exception, the Local Government Code cannot authorize what the constitution prohibits. *Maher*, 354 S.W.2d at 925. In other words, the constitutionally determinative issue is not solely the land's use as a "park" but also whether the primary purpose of the transfer of the condemned land to a third party was made for purposes prohibited by Section 17(b). Tex. Const. art. I § 17(a), (b).

Our holding in this case is distinguishable from *KMS Retail Rowlett, LP*, in which "[t]he City of Rowlett exercised its eminent[-]domain authority to take KMS's private-road easement and convert it to a public road connecting several commercial retail and restaurant sites." 593 S.W.3d at 178. There, the condemnee challenged the City's taking on Section 2206.001(b)(1)-(4). Although the Supreme Court addressed the statutory interpretation of, and interplay between, Subsections (b), (c), and (e) of Government Code Section 2206.001, the Court did not address the interplay of those subsections

---

fundamental law, and the amendment becomes just as much a part of the fundamental law as any section originally adopted." 6 Roy W. McDonald & Elain A. Grafton Carlson, *Texas Civil Practice*, § 40.11 (2nd ed. 2025) When the voters amend the Texas Constitution, the courts will enforce those amendments. *Smallwood v. City of Dallas*, 216 S.W.2d 272, 276 (Tex. App.—Dallas 1948, no writ)

with the 2009 amendments to Texas Constitution Article I, Section 17(a) and (b). In fact, in response to the dissent's position that the Court should eliminate the legislative deference rule in light of the 2009 amendments to the constitution, the majority noted,

> And we readily agree that constitutional text—especially when it has been amended since this Court developed its public-use jurisprudence—should rule over judge-invented interpretive rules. *See ETC Mktg., Ltd. v. Harris Cty. Appraisal Dist.*, 528 S.W.3d 70, 89 (Tex. 2017) (Brown, J., concurring) ("The text of the [c]onstitution, interpreted in light of its original meaning, should prevail over slavish devotion to judge-made, form-over-substance, multi-factor tests."). *But we are reluctant to explore this potentially fertile ground here because, simply put, no one has asked us to.*

*Id.* at 193–94 (emphasis added).

We are, however, guided by other concepts addressed in *KMS Retail Rowlett, LP*. First, the court noted that in drafting Government Code Section 2206.001(b), the legislature "sought to provide greater statutory limitations on takings for 'economic development purposes' that were the subject of the *Kelo* decision while maintaining the status quo for more traditional takings purposes." *Id.* at 184. The 2009 amendments to Article I, Section 17(b) are expressly directed at excluding from "public use" those takings where the *primary purpose* of taking the property is for transferring it to a private entity for *economic development or enhancement of tax revenues*. Tex. Const. art. I, § 17(b). Correspondingly, Section 2206.001(b)(4), acts as a statutory protection of this constitutional limitation. Subsection 2206.001(e), in conjunction with Section 2206.001(b)(4) should have constitutional priority.

Finally, as the court noted in *KMS Retail Rowlett, LP*, constitutional text should prevail over judge-made interpretive rules when the constitution has been amended since the formulation of those judge-made rules. Here, the Constitution was amended as an expression of the people's will to limit the government's right to condemn private property for transfer to other private parties when done for the primary purpose of economic development or enhancement of tax revenues. Tex. Const. art. I, § 17(b). This amendment occurred after the development of the legislative deference rule on "public purpose" and was adopted in response to the *Kelo* opinion, which had allowed such conduct under the federal Takings Clause. Because the provisions at issue here deal with a constitutional limitation on condemning private property for "public use" for the primary purpose of economic development or tax revenue enhancement, *KMS Retail Rowlett, LP*, is not dispositive.

### b. What is the proper standard of review in the absence of legislative deference on a "public use" finding?

What is the effect of this interpretation on the standard of review for this case, that is, without the historic deference given to legislative findings of "public use" to dictate that the government had stayed in its lane? First, a court has no subject-matter jurisdiction if the condemning entity cannot establish a viable claim. *Maberry v. Pedernales Elec. Co-op., Inc.*, 493 S.W.2d 268, 270 (Tex. App.—Austin 1973, writ ref'd n.r.e.) Challenging a court's subject-matter jurisdiction may be done through a plea to the jurisdiction, motion for summary judgment, or other procedural devices. *Bland ISD v.*

19

*Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000); *Jorolan v. Eads*, No. 02-23-00338-CV, 2025 WL 628340, at \*3 (Tex. App.—Fort Worth Feb. 26, 2025, no pet.) (mem. op.). A plea to the jurisdiction challenges a trial court's authority to exercise subject-matter jurisdiction over a claim or cause of action and "may challenge the pleadings, the existence of jurisdictional facts, or both." *Alamo Heights ISD v. Clark*, 544 S.W.3d 755, 770–71 (Tex. 2018); *Ramsey v. Miller*, No. 02-22-00412-CV, 2023 WL 3645468, at \*1 (Tex. App.—Fort Worth May 25, 2023, pet. denied) (mem. op.).

We review a trial court's ruling on a plea to the jurisdiction de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). In determining whether the plaintiff has met its burden of alleging facts that affirmatively establish the trial court's subject-matter jurisdiction, we look to the allegations in the plaintiff's pleadings and construe them in its favor. *Id.* "If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court[']s jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency," and the plaintiff should be afforded the opportunity to amend. *Id.* at 226–27. Conversely, if the pleadings affirmatively negate the existence of jurisdiction, then the plea may be granted without allowing the plaintiff an opportunity to amend. *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002).

If, however, the plea asserts an evidentiary challenge to the existence of jurisdictional facts, the standard of review is like that for a traditional motion for summary judgment. *Mission Consol. ISD v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012);

20

*Ramsey*, 2023 WL 3645468, at *1; *Sullivan v. City of Fort Worth*, No. 02-10-00223-CV, 2011 WL 1902018, at *2 (Tex. App.—Fort Worth May 19, 2011, pet. denied) (mem. op. on reh'g). We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Miranda*, 133 S.W.3d at 228. If the movant satisfies his burden to establish that the trial court lacks jurisdiction, the nonmovant is then required to show that there is a material fact question regarding the jurisdictional issue. *Id.* If the evidence raises such an issue, the plea cannot be granted, and a factfinder must resolve the issue. *Id.* at 227–28; *Jorolan*, 2025 WL 628340, at *4.[7] Conversely, if the relevant evidence is undisputed or fails to raise a fact issue, the plea must be determined as a matter of law. *Miranda*, 133 S.W.3d at 228; *Jorolan*, 2025 WL 628340, at *4.

We hold that under the circumstances presented in this case, the appropriate standards of review are those that apply to a plea to the jurisdiction or traditional motion for summary judgment. *See Mission Consol. ISD*, 372 S.W.3d at 635.

## III. Analysis

Owner brings two issues and City one cross-point. First, owner contends that the trial court erred in denying his plea to the jurisdiction. Under this issue, owner

---

[7]If the jurisdictional facts are not intertwined with the merits of the case, the trial court may decide the disputed fact issues. *Vernco Constr., Inc. v. Nelson*, 460 S.W.3d 145, 149 (Tex. 2015); *see Van Dorn Preston v. M1 Support Servs., L.P.*, 642 S.W.3d 452, 459 (Tex. 2022).

argues, in part, that post-*Kelo* amendments to the Texas constitution supersede prior judicial decisions mandating deference to legislative determinations of public use in connection with constitutional takings claims and that there was no public use under the facts of this case. Owner's first issue includes a challenge to the trial court's partial summary judgment, and he asks this court to render judgment dismissing City's suit or remand this case to the trial court to "for a determination of the constitutional permissibility of the taking" in light of the 2009 amendments. Owner's second issue contends that the trial court abused its discretion by denying owner's motion to join the United States Air Force as a necessary party.[8] Finally, owner's cross-point, which is a mirror image of the City's cross-issue, is whether the trial court properly awarded costs to owner.

We will sustain owner's first point in part, and we will remand the case to the trial court for further proceedings. Because we sustain owner's first issue in part, we need not decide his second issue and City's cross-issue. *See* Tex. R. App. P. 47.1.

The challenge to the court's subject-matter jurisdiction in this case was a challenge to the jurisdictional facts—whether the condemnation of the land was undertaken to transfer the land to a private entity for the primary purpose of economic development or enhancement of tax revenues, hence lacking in a "public purpose." *See*

---

[8]Owner contended that the United States Air Force, as the predecessor in title to the property, had several recorded restrictions and encumbrances on the land and that it should have been joined as a necessary party.

22

Tex. Const. art. I, § 17(a), (b); Tex. Gov't Code Ann. § 2206.001(b)(4). The evidence before the court was conflicting. Evidence supporting the condemnation being made for the "primary purpose of economic development or enhancement of tax revenues," *see Miles*, 647 S.W.3d at 637 (Devine, J., dissenting), included:

*the City's press release and the lease which acknowledged that the land was to be acquired by UPL as part of the golf course project, to be deeded back to the City and made part of the leased property;

*the City had to initiate condemnation proceedings for the land after owner refused to sell it voluntarily;

*the City's press release expressly stated, "These operations will also significantly add to the city's sales tax revenue";

*the City's press release that announced that the City would acquire a carried, non-dilutable equity interest in UPL, which can be inferred to be a form of economic development;

*the City's press release acknowledged that the City would benefit economically by "dramatically" increased revenues from the annual rental from UPL, and UPL would demolish the old clubhouse and build a new one at no cost to the City;

*the City Council meeting agenda that reported the City Council met in "executive session" to discuss "economic development" when it was discussing this lease agreement;

*the lease provided that the "intended [u]se of the [p]remises is solely for business or commercial purposes";

*City Council Resolution 2022-01 acknowledged that the acquisition of the land was to expand and operate the golf course to "serve existing and future development in the City"; and

*comments of the UPL founder in D Magazine that this joint partnering effort with the City was going to be a "premier facility" for UPL to become the leader in golf course entertainment.

23

To the contrary, Resolution 2022-01 recited that the condemnation was for a public purpose and a public use. While no legislative presumption attaches to this declaration, as explained above, it is still a declaration of "public use" by the condemning authority and is still probative of the issue of public use.[9] Additionally, the City's initial letter offer to owner recited that the offer was for the "public use and purpose of expanding and operating" the golf course, as did the City's final letter offer to purchase the property.

As noted above, the question of whether a taking is for a "public use" is a question of law. But, "public use" does not include a taking "for transfer to a private entity for the *primary purpose* of economic development or enhancement of tax revenues." Tex. Const. art. 1, § 17(b) (emphasis added). The determination of "purpose" is a fact question, and where the evidence on summary judgment regarding a person's purpose in his actions is conflicting, summary judgment is improper. *In re Elusive Holdings, Inc.*, 641 S.W.3d 498, 504 (Tex. App.—Austin 2021, no pet.) (conflicting evidence on proper purpose of shareholders' request of corporate records precluded

---

[9] *See Tex. Rice Land Partner, Ltd. v. Denbury Green Pipeline-Tex., LLC*, 363 S.W.3d 192, 202 (Tex. 2012) (holding a permit granting common-carrier status to a pipeline company is prima facie valid but the pipeline company must establish its common-carrier status bona fides to exercise power of eminent domain if landowner challenges its status as a common-carrier).

summary judgment on issue).[10] Certainly, if "purpose" is a fact issue then "primary purpose" is all the more a fact issue. Based on the authorities cited above, because the "primary purpose" of the transfer in question is an issue on the merits, and is subject to a conflict in the evidence, the trial court could not resolve it, and resolution would have been necessary by the jury. *City of Austin*, 384 S.W.3d at 778 (reciting that if facts regarding public use are in dispute then jury decides the fact dispute). We conclude that owner presented evidence that the government did not stay in its lane, and we sustain owner's first issue in part.

## IV. Conclusion

Having sustained owner's first issue in part, we reverse the judgment of the trial court and remand the case to the trial court for further proceedings consistent with this opinion.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: June 19, 2025

---

[10]*See also BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 204 (Tex. 2021) (holding that where summary judgment evidence of intent to ratify was conflicting, summary judgment on ratification was not proper).